No. 24,812.

KATHERINE STRICKLER WILCOX, SAMUEL KENNEDY STRICKLER, et al., *Appellees*, v. (IDA S. MILLER and WILLIAM E. MILLER, *Appellees*) FRANK E. HOLLAR and JANE D. SMITH, *Appellants*.

SYLLABUS BY THE COURT.

1. WILL—*Interpretation—Authority of Executor to Invest Funds in Land in Another State.* There is no principle of general law which absolutely forbids an executor who has authority under a will to invest funds in suitable real estate from investing in land in another state.

2. SAME—*Interpretation of Clause Authorizing Executor to Sell and Reinvest Funds in Other Real Estate.* Where a will devised land giving a life estate to a husband and wife with a remainder to their children, and a clause authorized the executor to sell it and invest the proceeds in other "suitable real estate, *which is to be held and enjoyed in all respects as the part sold, and with the same restrictions in all respects,*" the italicised language is held to refer to the tenure of the devisees and not to impose a requirement that the property purchased shall be subject to the same rules of descent in case of intestacy as that sold.

3. SAME. A statute to the effect that a trustee may invest funds in real estate by leave of the proper court, provided that the investment be in the court's opinion "for the advantage of the estate, and no change be made in the course of succession by such change of investment, as regards the heirs or next of kin of the *cestui que* trust," is held not to apply to an investment of funds made by an executor under authority given by the will to sell certain property and invest the proceeds in other suitable property.

4. SAME—*Executor Investing Funds in Lands of Another State—Rules of Descent in Case of Intestacy.* Where an executor sells land in the state

of the residence of the testator and invests the proceeds in land in another state where the rules of descent in case of intestacy are different, the land so purchased cannot thereby be literally made subject to the rules of descent of the state first referred to, assuming that in some circumstances a court of equity might effect such a distribution as to bring about the same practical result. It is held that such interposition of equity is not required in the situation stated in the second paragraph of this syllabus.

5. SAME—*Parties Confirming Action of Executor in Investing Funds in Lands in Another State.* Persons who might otherwise have a right to invoke the aid of a court of equity in the situation referred to in the foregoing paragraph are precluded therefrom by confirming the action of the executor in purchasing such land, this effect resulting from their conduct, not only with respect to the interests devised to them by the will, but also with respect to any interests which they may have acquired through other devisees.

6. SAME—*Interpretation of Clause Relating to Descents—Family Settlements.* In the situation stated in the second paragraph of this syllabus a provision made in a family settlement, after the purchase of the land outside the state by the executor, that he should make a deed, (which was done) conveying the purchased land in accordance with the terms of the will "so that the same shall be held and enjoyed in all respects" as the land devised, which he had sold, "and with the same restrictions" does not mean nor imply that the land purchased was to be impressed with the quality of descending according to the laws of another state than that in which it is situated, but merely that the tenure of the devisees is to be the same as in the case of the land devised.

Appeal from Geary district court; CASSIUS M. CLARK, judge. Opinion filed January 12, 1924. Affirmed.

*L. B. Morris, U. S. Weary, W. W. Pease,* all of Junction City, *T. M. Lillard,* of Topeka, *E. M. Biddle,* of Carlisle, Pa., and *Q. T. Mickey,* of Shippensburg, Pa., for the appellants.

*James V. Humphrey,* and *Arthur S. Humphrey,* both of Junction City, for the appellees.

The opinion of the court was delivered by

MASON, J.: This is an action to determine the ownership of a tract of land in Geary county, Kansas. The facts are not in dispute and the correctness of the judgment turns upon the effect of the purchase of this land in 1869 by an executor of the will of James J. Kennedy, a resident of Pennsylvania, who died in 1863. By that will land in Pennsylvania was devised to the testator's son Joseph C. Kennedy and that son's wife Margaret C. Kennedy, for their lives, the fee going to their children. A clause of the will read:

Wilcox v. Hollar.

"If said Joseph and wife during the minority of their children should deem it for the interest of themselves and family to sell all or any portion of said property by expressing their wish in writing to thaƀ effect, my executors hereinafter named may sell the whole or any portion of same at public or private sale, and make the necessary conveyances therefor, and the money arising from such sale is to be re-invested by said executors in the purchase of suitable real estate, which is to be held and enjoyed in all respects as the part sold, and with the same restrictions in all respects."

Acting under the authority so given, Thomas B. Kennedy, one of the two executors, who will be hereinafter spoken of as the executor, sold a part of the Pennsylvania land and with a part of the proceeds purchased the Kansas land here in controversy, taking title as trustee and executing a declaration of such trusteeship in accordance with the provision quoted.

If the land acquired in this way was subject in the event of any of the devisees dying intestate to distribution according to the Kansas law, the trial court correctly apportioned its ownership, the devolution of title being as follows: Joseph C. and Margaret C. Kennedy had six children, each of whom would have enjoyed a $\frac{1}{6}$ interest if all had outlived their parents. Only one of them, Ellen C. Strickler, had issue—the three plaintiffs, Katherine Wilcox, Samuel Strickler and Willard Strickler. Three of the children of Joseph C. and Margaret C. Kennedy—Margaret, Thomas B. and Ariana—died intestate before either parent, without having married. Their shares of the fee passed to their parents, who together became the owners of half the fee, each owning an undivided $\frac{1}{4}$ or $\frac{12}{48}$s of it. Another daughter, Mollie S. Hollar, died intestate in 1891 and her share of $\frac{8}{48}$s passed to her husband, Frank E. Hollar, one of the defendants, where it remains. Upon the death of Margaret C. Kennedy intestate, in 1895, one-half of her share, or $\frac{8}{48}$s of the title, passed to her husband, increasing his share to $\frac{18}{48}$s; one-half of the other $\frac{8}{48}$s, or $\frac{8}{48}$s of the title, passed to her daughter, Ellen C. Kennedy, the plaintiffs' mother, making her share $\frac{11}{48}$s; and the other $\frac{8}{48}$s passed to her only other surviving child, Jennie P. Miller, making (with her original sixth) her interest in the fee $\frac{11}{48}$s, which was willed by her to her husband and by him to his son by a second wife, William E. Miller, one of the defendants, who still holds it. Upon the death of Ellen C. Kennedy intestate in 1897 one-half of her $\frac{11}{48}$s passed to her children, the plaintiffs, and the other half to her husband, who deeded it to the plaintiffs. Joseph C. Kennedy died intestate in

1902 after the death of all his children, and his $^{18}$⁄s passed to the plaintiffs, his only surviving issue, bringing their share up to $^{22}$⁄s.

Frank E. Hollar, who will be spoken of as the appellant, appeals from the judgment upon the ground that the shares of the three children of Joseph C. and Margaret C. Kennedy, who died before the others, should not be distributed according to the Kansas law of descents, but according to that of Pennsylvania, by which (subject to dower and curtsy) the fee of the realty of an intestate having no issue goes to brothers and sisters and their issue, the parents taking only a life estate. The appellant's contention may be thus stated: Both by the general principles of law and by local statute the executor of James J. Kennedy had no legal right to purchase real estate outside of Pennsylvania; and because he wrongfully invested the funds in his hands in property subject to a different rule of descent from that of his own state the property so acquired should by the application of the rule of equitable conversion, or by analogy with it, be treated as subject to the rules of descent that would have applied if he had observed the law and made the investment in Pennsylvania land.

The Pennsylvania statute referred to reads:

"It shall and may be lawful for any trustee, committee, guardian or other person acting in a fiduciary capacity, to invest trust moneys in ground rents, or other real estate, by leave of the proper court, under proceedings as provided in the act to which this is a supplement: *Provided,* That it shall be the opinion of the court that such investment will be for the advantage of the estate, and no change be made in the course of succession by such change of investment, as regards the heirs or next of kin of the *cestui que* trust." (Pennsylvania Statutes, § 21319.)

The plaintiffs respond that the purchase of land outside the state was not forbidden by any general principle of law or by the statute, and was in any event not absolutely void; that so far as it was objectionable the remedies open to persons injured by it did not include that of demanding the distribution of the land in accordance with the Pennsylvania law of descents; and that even if such a remedy would otherwise have been open the appellant is prevented from resorting to it by having ratified the purchase by the executor. The soundness of these propositions is involved in the appeal now under consideration.

1. Outside of Massachusetts and Vermont the prevailing rule appears to be that an executor or trustee ought not to invest funds

held in that capacity in property beyond the jurisdiction of the court. (39 Cyc. 392; 26 R. C. L. 1313.) Expressions are sometimes used suggesting an entire lack of power to make such an investment when not expressly authorized. Often however the question presented is of the desirability of a particular purchase, and it is said that "the doctrine of many courts is that the trustee who invests beyond the jurisdiction does so at the peril of being held responsible for the safety of the investment." (26 R. C. L. 1313; see, also, *Sharswood's Estate*, 23 Pa. Dist. Rep. 127.) A like difference of judicial opinion exists as to whether a trustee may without explicit authorization invest in corporate stocks and bonds the majority view being in the negative. (39 Cyc. 401-2; 26 R. C. L. 1309-10; notes, 12 A. L. R. 574, 26 A. L. R. 812.) A recent case holds that this question is largely one of the good faith of the trustee; that specific directions to invest in good, safe securities does not limit his choice to those included in a trust investment list kept by the court; and that "where a testator does not direct the trust established by him to be administered under direction of the court, a court will not interfere further than to ascertain that the trustees act as an ordinarily prudent man would do in investing his own funds." (*Fox v. Harris*, 141 Md. 495; 26 A. L. R. 806.) There could have been no presumption at the time the Kansas land was bought by the executor that the venture was imprudent from a business standpoint, and the result seems to prove the fact to have been far otherwise, its value having advanced from $5.62½ to $100 an acre. In Pennsylvania cases cited in the briefs it has been held that the estate of a trustee will be liable for losses incurred in investments not authorized by law (*Gaw's Estate*, 12 Phila. 4); that executors are not liable for a loss incurred by investing in stock of a private corporation under a testamentary direction to invest in any "public stock or securities" (*Rush's Estate*, 12 Pa. St. 375); that a testamentary trustee was liable for a loss by investing in bonds secured by mortgage on a plant in another state, great stress being laid, however, on the fact that the investment was made recklessly and without investigation—without the exercise of "common skill, common prudence, nor common caution" (*Hart's Estate*, 203 Pa. St. 480); and that a trustee was not liable for the depreciation of mortgages on property in an adjoining state, due care having been used by him (*Gouldey's Estate*, 201 Pa. St. 491).

The appellant suggests that the direction to the executors to invest in "suitable" real estate means suitable in point of law as well as in other repsects. Granting this we conclude that there cannot be said to be a hard and fast rule of law that an executor who is directed by the will to invest funds in his hands in real estate has no power under any circumstances to buy land in another state than that of the testator's residence—no rule that would make the purchase in the present case a nullity or prevent the passing of title. The testator appears to have relied upon the sound judgment of the executors in the making of new investments.

2. The language of the will providing that the executors should purchase other "suitable real estate, which is to be held and enjoyed in all respects as the part sold, and with the same restrictions in all respects" we regard as meaning merely that the possession and title should pass to the life tenants and remaindermen as designated in the will. We see no ground for interpreting the quoted words as an attempt to control the rule of descent from these persons in the event of their dying intestate.

3. We do not think the Pennsylvania statute quoted forbade the purchase of Kansas land by the executor, for this reason: It seems to apply solely to investments made by virtue of the authority which it grants, the proviso against a change in the course of succession being a limitation on the power so granted. Here the purchase was made upon the authority of the will itself and no recourse to the statute is necessary. To hold otherwise would require us to say as well that a purchase could not be made without a finding by the court that the investment would be for the advantage of the estate.

4. If the Kansas land were to be regarded as having been bought by the executor illegally because of its lying outside of Pennsylvania it would not thereby become literally subject to the law of descent of the latter state. But in a proper case a court of equity might effect such a distribution as would bring about the same practical result. Two related decisions cited by the appellant present an instance of the application of the doctrine of equitable conversion to the exchange of land in one state for that in another, with the result that the rule against perpetuities of the former state was avoided. (*Ford, Ex'r, v. Ford et al.,* 70 Wis. 19; *Ford v. Ford,* 80 Mich. 42.) They do not in our judgment, however, shed much light upon the difficulties of the present case. In a Pennsyl-

vania case it was said, "We think it may properly be considered a sound rule, that a sale made by trustees, for the convenient management of the trust, and not under positive directions in the will, does not alter the course of distribution." (*Henszey's Estate*, 220 Pa. St. 212, 216.) But the facts in this case likewise give it little application here. Clearly the quality of descending according to the laws of another state (actually or practically through the interposition of a court of equity) could not be imposed upon land permanently or for an indeterminate period. Here the enjoyment of the property by the persons to whom the testator left it—who were designated in the will as beneficiaries—was in no way interfered with by the exchange of Pennsylvania land for Kansas land. Nor was their power to dispose of it by deed or will hampered by such change except that by the Kansas law they were prevented from diverting more than half their real estate by deed or will from a surviving spouse who had been a resident of this state. That provision of our statute is a matter of legislative policy rather than a mere rule of descent. It had no practical effect upon the three grandchildren of the testator who died first, and the disposition of whose shares is in controversy, because not one of them was ever married. None of the six grandchildren came into the possession and enjoyment of the land, because their father survived all of them. But each became the owner of one-sixth of the fee and could (save for the reservation already noted) have disposed of that interest by deed or will to a stranger, who would of course have held it subject to the law of Kansas. By omitting to do so each may be regarded as directing the devolution of title that the trial court held had taken place, by electing not to make any other disposition of the property. In the hands of grantees of the six grandchildren the land, or interests in it, would plainly be subject to the Kansas law of descents, and we think it was no less so while held by themselves. They and not their heirs were the object of their grandfather's solicitude, and we see no ground for attributing to him any concern as to where the property was to go if they should die intestate while holding the title. Nor do we perceive any meritorious claim to equitable protection on the part of those who would have inherited from them if no exchange of land had taken place. Their attitude toward the land was merely that of persons who might possibly inherit it. They did not bear such relation to the trust fund as do the beneficiaries of the ordinary application of the

doctrine of equitable conversion, where property, whether actually real or personal, is treated as of the character in that regard which will give effect to the expressed wishes of the creator of the trust.

5. Even assuming that the executor had no right to buy the Kansas land, he did buy it. The appellant does not challenge the passing of the title. If the act was wrongful any one injured thereby may have had a claim against the executor for damages; or perhaps a rescission might have been demanded. But we cannot accept the theory of the title passing with a condition that in the hands of the first takers of the fee it was subject to the Pennsylvania law of descent. In this aspect of the matter the conclusion we reach is strengthened by a writing signed in June, 1890, by the appellant and his wife, Mollie S. Hollar, Joseph C. and Margaret C. Kennedy, and Jennie P. Miller and her husband, containing a clause releasing the executor from all liability "on account of anything done in the management of the trust under said will, hereby ratifying and confirming all things whatsoever he did in the premises"; confirming "all the proceedings for the sale of said lands in said will devised to said Joseph C. Kennedy, and for the reinvestment of the moneys arising from such sale"; and releasing the executor "for or on account of any interest, right, profit, claim or demand . . . in and to any lands whatsoever in which the moneys arising from such sale were invested." One of the recitals read, "And whereas, the undersigned wish to sanction and confirm all that has been done by the said Thomas B. Kennedy, executor of the said James J. Kennedy, deceased, in the premises, having a full understanding thereof." The instrument did not become a completed agreement, because not signed by the plaintiff's parents, but it was delivered to the executor by the signers as evidence that Mollie S. Hollar and her husband and Jennie P. Miller and her husband approved and sanctioned the act of the executor in buying the Kansas land.

The appellant conceives that this contract released the land in question from the operation of the Pennsylvania law of descents and made the Kansas statute applicable from that time on, for otherwise he could not have inherited his wife's interest upon her death a year or so later. But he contends that when the three unmarried grandchildren died without having ratified the sale their title passed to the others under the Pennsylvania law, his wife acquiring one-third of their interest, or one-sixth of the fee, and that her title to this was not affected by her ratifying in her own behalf the purchase of Kansas land made by the executor. We do not

accept this theory. When the appellant's wife, assuming that she held one sixth of the fee by virtue of the direct devise and another as an heir of her brother and two sisters, confirmed the purchase of the land by the executor, we think she was precluded from thereafter asserting a title based upon the invalidity of the sale, whether the process by which this result was brought about be described as ratification, waiver, estoppel, the obligation to be consistent in conduct, or by any other word or phrase. Having confirmed the purchase and released the executor from all claims on account of it she was not in a position to seek the aid of equity to assert or transmit a title founded upon its illegality.

6. The defendant William E. Miller gave no separate notice of appeal, but having been served with that of Frank E. Hollar urges the same grounds of modification of the judgment that have already been considered and makes the further contention that in the course of a family settlement agreements were made which required the distribution of the land in accordance with the Pennsylvania law. In November, 1891, Joseph C. Kennedy brought in Pennsylvania an equitable action involving to some extent the question now before this court, to which his only two surviving children and the husband of the only other child who had married were parties. It was settled out of court by a writing (Jennie P. Miller and her husband and the plaintiffs' mother and her husband being among the signers) providing that the executor should be released from all claims and should make a deed (which he did) conveying the Kansas land in accordance with the terms of the will "so that the same shall be held and enjoyed in all respects as the one hundred acres devised to said Joseph in and by the said will of the said James J. Kennedy, deceased, sold by the executors, and with the same restriction." The additional argument in behalf of William E. Miller is in substance that the clause above quoted and others of like nature should be interpreted as meaning that the Kansas property should be subject to the Pennsylvania laws of descent. We do not regard that construction as justified. To us the purpose of the provisions referred to seems to be merely that the Kansas property should be disposed of as though it had been owned by the testator and had been devised in the will as the Pennsylvania land was, the manner of its descent after reaching the designated devisees not being one of the subjects considered or acted upon.

The judgment is affirmed.