**CARPENTER et al. v. SHAW, State Auditor.**

No. 19122.  Opinion Filed Sept. 18, 1928.

Rehearing Denied Dec. 18, 1928.

Stephen A. George, for plaintiffs in error.

Edwin Dabney, Atty. Gen., and V. P. Crowe, Asst. Atty. Gen., for defendant in error.

RILEY, J. This is an appeal by the plaintiffs below from a judgment against them denying recovery of gross production taxes paid the State Auditor under protest and upon oil and gas produced from lands situated in Carter county.

In the first cause of action it was alleged that T. L. Carpenter was enrolled as a Choctaw Indian by intermarriage, and that Lillie B. Carpenter was enrolled as a Choctaw Indian of one-sixteenth blood, and that they own allotments located in Carter county from which oil and gas was produced during the calendar year 1926, and that for the year ending December 31, 1926, plaintiffs received the sum of $16,333. from the sale of royalty oil and gas produced from their allotments, and that during the quarter ending March, 1927, plaintiffs received the sum of $4.000 for the amount of royalty oil and gas produced from their lands, and that on April 30, 1927, plaintiffs paid to the defendant the sum of $490, the same being equivalent to

three per cent. of the gross amount received from the sale of said oil and gas during the year ending December 31, 1926, and at the same time they paid the defendant $120. as gross production tax on oil produced for the quarter ending March 31, 1927, and that both sums were paid under protest and upon production representing the royalty interest to such minerals from the lands described.

In the second cause of action it was alleged that Mattie L. V. Zachary was enrolled as a Choctaw Indian of one-sixty-fourth blood and possessed an allotment in Carter county from which oil was produced under lease executed by her on her allotment to the Gypsy Oil Company and the Sinclair Oil & Gas Company, which lease reserved to her a one-eighth royalty of all oil and gas produced, and that the said Zachary had, on the 30th day of April, 1927, paid the State Auditor the sum of $72.18 being three per cent. of the gross amount of royalty oil and gas received by her during the quarter ending December 31, 1926, and on the same date paid the State Auditor the sum of $111.06, an equivalent of three per cent. of the royalty received during the quarter ending March 31, 1927, and that said payments were made under protest as required by law, and that her cause of action for recovery of said taxes has been assigned to plaintiffs below, and suit has been commenced to recover the same within 30 days.

In the third cause of action it was alleged that Julia A. Morris was enrolled as a one-thirty-second blood Choctaw Indian and had received an allotment in Carter county upon which she had executed a lease to the Magnolia Petroleum Company, and reserved to herself a one-eighth interest as royalty, and that for the calendar year ending December 31, 1926, and the quarter ending March 3, 1927, she had paid to the State Auditor, under protest, on April 30, 1927, three per cent. of the moneys received as royalties, and that the said Julia A. Morris had assigned to the plaintiffs her cause of action for the recovery of said gross production taxes so paid.

In each of the causes of action it was alleged that the allottee had not parted with title to the said allotments and that 21 years from date of patent had not expired, and that by virtue thereof said minerals so produced were not subject to the Gross Production Tax Act of the state of Oklahoma. It also appears from the allegations of each cause of action that none of the gross production tax due for the calender year 1926 was paid at the time and in the manner as provided by law, but that they were all paid when the first quarter annual period tax for the year 1927 was paid, which was on April 30, 1927. The taxes due on said mineral for the quarter ending March 31, 1927, were paid at the time and in the manner provided by law.

A demurrer to the petition of plaintiffs was sustained by the district court, and plaintiffs below elected to stand upon their petition. The trial court rendered judgment dismissing the cause, from which the plaintiffs in error appeal.

We first consider the procedure adopted by plaintiffs relative to the time of payment of the gross production tax claimed for the year ending December 31, 1926.

Section 9814, C. O. S. 1921, provides for levies of gross production tax of three per cent. upon minerals produced within this state and specifies the time and manner of payment and provides the procedure to be followed for the recovery of such taxes paid under protest. That section reads in part as follows:

"Every person, firm, association, or corporation engaged in the mining or production within this state of asphalt or of ores bearing lead, zinc, jack, gold, silver, or copper, or of petroleum or other crude oil or other mineral oil or of natural gas, shall within 30 days after the expiration of the quarter annual period ending on the last day of March, A. D. 1916, and of each quarter annual period thereafter expiring respectively, on the last day of June, September, December, and March of each year, file with the State Auditor, a statement under oath, on forms prescribed by him showing the location of each mine or oil or gas well operated by such person, firm, corporation or association during the last preceding quarter annual period; the kind of such mineral, oil or gas produced; the gross amount thereof produced and the actual cash value thereof at the place of production; the amount of the royalty payable thereon, if any, to whom payable and whether it is claimed that such royalty is exempt from taxation by law, and the facts on which such claim of exemption, if any, is based; and such other information pertaining thereto as the State Auditor may require, and shall at the same time pay to the State Auditor a tax equal to one-half of one per centum of the gross value of asphalt and of ores bearing lead, zinc, jack, gold, silver and copper produced, less the royalty interest, and equal to three per centum of the gross value of the production of petroleum or other crude or mineral oil and of

natural gas, less the royalty interest. The owner of any royalty interest shall pay to the State Auditor the tax herein imposed upon such royalty interest within the time and in the manner provided by this act.

"The tax hereby declared shall also attach to and is levied on what is known as the royalty interest except such royalty interest of the state of Oklahoma or such royalty interests as are exempted from taxation under the laws of the United States, and the amount of the tax on the royalty interest shall be a lien on such interest. * * *

"The payment of the taxes herein imposed shall be in full and in lieu of all taxes by the state, counties, cities, towns, township, school districts and other municipalities upon any property rights attached to or inherent in the right to said minerals, upon leases for the mining of asphalt and ores bearing lead, zinc, jack, gold, silver or copper, or for petroleum or other crude oil or other mineral oil or for natural gas upon the mining rights and privileges for the minerals aforesaid belonging or appertaining to land, upon the machinery, appliances and equipment used in and around any well producing petroleum or other crude or mineral oil or natural gas, or any mine producing asphalt, or any of the mineral ores aforesaid and actually used in the operation of such well or mine; and also upon the oil, gas, asphalt or ores bearing minerals hereinbefore mentioned during the tax year in which the same is produced, and upon any investment in any of the leases, rights, privileges, minerals or property hereinbefore in this paragraph mentioned or described; but any interest in the land other than that herein enumerated, and * * * hereinbefore named, * * * produced and on hand at the date as of which property is assessed for general and ad valorem taxation for any subsequent tax year shall be assessed and taxed as other property within the taxing district in which such property is situated at the time."

From a reading of the quoted portion of the act, it will be noted that the amount of oil produced is required to be reported to the State Auditor within 30 days after each quarter annual period, which periods expire on the last day of June, September, December, and March of each year. Payment of gross production taxes is required to be made upon those dates; consequently, gross production taxes due for the first quarter of the year 1926, were required to be made not later than April 30, 1926, and payment for the second quarter was required not later than July 30, 1926, and payment for the third quarter not later than October 30, 1926, and for the fourth quarter not later than January 30, 1927. None of the taxes due and payable for the calendar year 1926 were paid on the dates required, but payment therefor was made on the later date of April 30, 1927; consequently, it appears that only the taxes due for the quarter due March 31, 1927, were paid at the time and in the manner provided by law.

Plaintiffs' cause of action for the recovery of these taxes is based upon section 9971, C. O. S. 1921, which provides:

"In all cases where the illegality of the tax is alleged to arise by reason of some action from which the laws provide no appeal, the aggrieved person shall pay the full amount of the taxes at the time and in the manner provided by law, and shall give notice to the officer collecting the taxes showing the grounds of complaint and that suit will be brought against the officer for recovery of them. It shall be the duty of such collecting officer to hold such taxes separate and apart from all other taxes collected by him, for a period of 30 days, and if within such time summons shall be served upon such officer in a suit for recovery of such taxes, the officer shall further hold such taxes until the final determination of such suit. All such suits shall be brought in the court having jurisdiction thereof, and they shall have precedence therein; if, upon final determination of any such suit, the court shall determine that the taxes were illegally collected, as not being due the state, county, or subdivision of the county, the court shall render judgment showing the correct and legal amount of taxes due by such person, and shall issue such order in accordance with the court's findings, and if such order shows that the taxes so paid are in excess of the legal and correct amount due, the collecting officer shall pay to such person the excess and shall take his receipt therefor."

The applicable section quoted requires as a prerequisite to the recovery of taxes that the same shall be paid at the time and in the manner provided by law.

In St. L. & S. F. Ry. Co. v. Hendrickson, 127 Okla. 242, 260 Pac. 476, construing the above section, this court said:

"By section 9971, C. O. S. 1921, the right to maintain an action for the recovery of an illegal tax is conditioned on compliance with all the requirements therein contained. And in such case, where a petition on its face shows that one of the essential requisites has not been complied with, it fails to state a cause of action, and is fatal on demurrer."

See, also, St. L. & S. F. Ry. Co. v. Hendrickson, 128 Okla. 266, 263 Pac. 148: Okla. News Co. v. Ryan, 101 Okla. 151, 224 Pac. 969; First Natl. Bank of Muskogee v. Pitts, 120 Okla. 8, 249 Pac. 907; State ex rel.

Mothersead v. Bennett, 114 Okla. 76, 243 Pac. 726.

We, therefore, hold that unless taxes are paid at the time and in the manner provided by law, they cannot be recovered under the procedure provided by section 9971, supra. It follows that plaintiffs were not entitled to maintain their action in so far as was concerned recovery of taxes due for the year ending December 31, 1926, for the reason that said taxes were not paid until April 30, 1927, and, therefore, not at the time and in the manner provided by law.

Appellants seek to avoid the rule above announced by applying the decision of the Supreme Court of the United States in Ward v. Board of County Commissioners of Love County, 253 U. S. 17, 64 L. Ed. 751. It appears that case concerned the action of the plaintiff and 66 other Indians to recover taxes which they had paid in Love county, Okla., on lands which had been held exempt from taxation by the decision in Choate v. Trapp, 224 U. S. 665, and it appears that plaintiffs had failed to give notice of protest at the time of payment of such taxes. That decision considered whether or not the taxes were paid at the time and in the manner provided by law. The Supreme Court of the United States held that, inasmuch as the Indians had had numerous lawsuits pending in numerous places resisting the collection of taxes, it could not be said that the taxes were voluntarily paid, and the second paragraph of the syllabus of the reported case is as follows:

"Indian allottees who, through pending suits and otherwise, were objecting and protesting that the collection of certain sums from them by a county as taxes on their allotments was forbidden by a law of Congress, cannot be said to have paid such taxes voluntarily, so as to defeat their right to compel restitution, where notwithstanding such protest, the county demanded payment of the taxes, and by threatening to sell the lands and by actually selling other lands similarly situated, made it appear to such allottees that they must choose between paying the taxes and losing their land, with the result that, to prevent a sale and to avoid the imposition of a penalty of 18 per cent., they yielded to the county's demand and paid the taxes, protesting and objecting at the time that the same were illegal."

There it was decided that where the state's statute provided that taxes voluntarily paid could not be recovered, such provision did not bar recovery in that cause, because the facts showed that payment was not volun-

tarily made. As we view it, that decision is not decisive of the issue here.

Plaintiffs also rely upon the case of Walker v. Hays, 127 Okla. 123, 260 Pac. 15. There the taxes levied were upon a dwelling house which a full-blood Choctaw Indian had built upon an allotment, which allotment was exempt from taxation. This court held that the houses were a part of the realty; that the realty was exempt and that equitable relief was available to prevent a tax sale of the realty for the reason that the whole assessment was void ab initio. That decision is not decisive as to the manner of payment, unless it can be said that the levy is wholly void, which contingency is dependent upon whether or not the property taxed is personal property or real estate, which is hereafter considered.

The decision of McCoy v. Childers, 124 Okla. 256, 256 Pac. 25, is decisive of the issue as to the manner of payment, and concerns an action to enjoin the collection of gross production taxes upon a royalty interest of an Indian situated exactly as are plaintiffs in error. An appeal from the decision in that case was prosecuted to the Supreme Court of the United States, and by the opinion there rendered, the judgment of this court in effect was affirmed in McCoy v. Shaw, 72 L. Ed. 584. Therefore, we hold, as to the recovery of the taxes paid for the calendar year 1926, plaintiffs below failed to state a cause of action, because such taxes were not paid at the time and in the manner provided by law, and as to the cause of action for the recovery of such taxes, the demurrer was properly sustained.

Appellant contends that royalties of these plaintiffs are not subject to the payment of the gross production tax of the state of Oklahoma for the reason that the tax exemption period under which their lands were allotted to them has not expired, and a tax on such royalties is in fact a tax on said exempt lands, whether (a) said mineral royalties are attempted to be taxed as such, or (b) whether they be considered as ordinary rents and produce of said land.

For our determination whether appellant's property was exempt from taxation under any act of Congress, it is necessary to consider briefly the acts of Congress relating to the land of plaintiffs below.

By the Act of Congress, June 28, 1898, 30 Stats. 495, commonly known as the Atoka Agreement, and relating to the Choctaw and Chickasaw Nations, a separate allotment for each of said Indians was provided. Such

allotments were made to be exempt from taxes for a specified period. The provision is:

"All allotted land shall be nontaxable so long as title remains in the original allottee, not exceeding, however, 21 years from the date of patent."

It is the contention of the appellants that oil produced from their lands is exempt from taxes by reason of the above provision.

Subsequent to the enactment of the Atoka Agreement, Congress passed the Act of May 27, 1908, 35 Stats. 312, which provided in part as follows:

"That from and after 60 days from the date of this act, the status of the lands allotted heretofore or hereafter to allottees of the Five Civilized Tribes shall, as regard restrictions on alienation or incumbrances, be as follows: 'All lands including homesteads of said allottees enrolled as intermarried whites, as freedmen, and as mixed-blood Indians having less than half Indian blood, including minors, shall be free from all restrictions.' * * * That all land from which restrictions have been or shall be removed shall be subject to taxation and all other civil burdens as though it were the property of other persons than allottees of the Five Civilized Tribes."

The quoted provision of the Act of Congress of May 27, 1908, applies to the appellants in this case, who are less than one-half Indian blood, in so far as the Act of Congress remains intact. In other words, restrictions against alienations as to these plaintiffs were by said act removed, and by reason of that act appellants were free to sell their land, or to lease the same, or to dispose of it in any manner they saw fit without the aid of governmental supervision. It will be noted also that Congress attempted, by the act, to make the lands upon which restrictions against alienation were removed, taxable, but the validity of that portion of the act which sought to make the lands of less than one-half blood Indians subject to taxation was presented to the Supreme Court of Oklahoma in Choate v. Trapp, supra, and finally was passed upon by the Supreme Court of the United States in Choate v. Trapp, supra, and the Supreme Court of the United States held, by the third paragraph of the syllabus:

"Choctaw and Chickasaw allottees, under the Atoka Agreement embodied in the Act of June 28, 1898, under which, in part consideration of the relinquishment of all claim to the tribal property, they were to receive allotments of the lands in severalty which were to be nontaxable for a specified

period, while the title remained in the original allottees, acquired vested rights of exemption from state taxation, protected by U. S. Constitution, 5th Amendment, from abrogation during that period, was attempted by the Act of May 27, 1908 (35 Stat. at L. 312, chap. 199), removing the restrictions upon alienation, and providing that lands from which such restrictions had been removed should be subject to taxation."

And in the body of the opinion:

"The provision 'that all lands shall be nontaxable' naturally indicates that the exemption is attached to the land, * * * only an artificial rule can make it a personal privilege."

The case of Choate v. Trapp, supra, announces the principle that Congress was without authority to abrogate the vested right of an Indian to nontaxable land for a definite period. However, that decision deals solely with the right of the state to tax the Indian's land and does not consider personal property belonging to such Indians, nor oil produced from such land.

Cooley on Taxation, p. 146, lays down the rule that: "The intention to exempt must in any case be expressed in clear and unambiguous terms."

In Llewellyn v. Colonial Trust Co., 72 L. Ed. (U. S.) 19, it was held:

"Tax exemptions are never lightly to be inferred."

In Goudy v. Meath, 203 U. S. 146, 51 L. Ed. 130, it was considered whether the lands owned by an Indian were exempt from taxation. It was said:

"His property, unless exempt, became subject to taxation in the same manner as property belonging to other citizens, and the rule of exemption for him must be the same as for other citizens—that is, that no exemption exists by implication, but must be clearly manifested."

Therefore, it is our view that Congress, by its act known as the Atoka Agreement, exempted from taxation only the land of these appellants, and by reason of the principle that exemptions from taxation by implication are not favored, and since Congress has evidenced its desire to tax the lands of these appellants, that such tax exemption should not extend to the oil produced from said land. This for the reason that the oil as taxed is severed from the land and has become personal property and not subject to the exemption which extends to the land.

In the case of Forbes v. Gracey, 94 U. S. 762, an action was brought to force the

collection of the Nevada gross production tax. The tax by the state of Nevada was imposed upon the proceeds of a mine worked by a corporation. Payment of the tax was resisted on the ground that title to the land from which the mineral was taken was in the United States, and for that reason not subject to state taxation. In the cited case it was held that the state had power to impose the tax in question upon the minerals taken from the land; that the moment the ore became detached from the soil in which it was embedded it became personal property subject to taxation, although the land from which it was taken was not taxable. That decision contains the following language:

"It is very true that Congress has, by statutes and by tacit consent, permitted individuals and corporations to dig out and convert to their own use the ores containing the precious metals which are found in the lands belonging to the government, without exacting or receiving any compensation for these ores, and without requiring the miner to buy or pay for the land. It has gone further, and recognized the possessory rights of these miners, as ascertained among themselves by the rules which have become the laws of the mining districts as regards mining claims. See Revised Statutes, Title 32 chap. 6, sections 2318-2352. But in doing this it has not parted with the title to the land, except in cases where the land has been sold in accordance with the provisions of the law on that subject. If the tax of the state of Nevada is, in point of fact, levied on this property right of the United States, we are bound by our previous decisions and by soound principle to hold that it is void. If, on the other hand, it is levied on property of the miner, and may be collected without affecting or embarrassing the title of the United States to property which belongs to that government, then there is no ground for interference with the processes of the state in its collection. A few extracts from the statute of Nevada, showing the nature and character of the property on which the contested tax is imposed, and the manner of its enforcement and collection, will enable us to decide whether it belongs to the one or the other of these classes. We copy here the important sections of the Act of February 28, 1871, imposing this tax: (here the court quotes the statutes). * * *

"As we construe the statutes of the United States and the recognized rule of the government on this subject. the moment this ore becomes detached from the soil in which it is embedded it becomes personal property, the ownership of which is in the man whose labor, capital and skill has discovered and developed the mine and extracted the ore

or other mineral product. It is then free from any lien, claim, or title of the United States, and is rightfully subject to taxation by the state as any other personal property is.

"The truth of this proposition is too obvious to need or admit of illustration or elaboration, and, as we have already said, the pressure of business does not admit of it.

"In regard to the taxing of this personal property, and the mode of collecting it by sale as provided in the section last cited, it does not seem to us that there can be any reasonable ground for asserting that the United States has any interest in the tax or in the sale of the property taxed."

The lands involved in the cited case were as free from state taxation as the lands involved in the case at bar, yet in the cited case, notwithstanding the fact that the lands were nontaxable, the court held, and we follow the rule, that when the minerals were produced, they became personal property and as such were subject to taxation.

Plaintiffs contend that the foregoing case is not analogous to the instant case in that in the case cited the government did not own the minerals, where in this case the appellants enjoy the royalty interest in the minerals sought to be taxed.

We hold such contention is a distinction without a difference.

A controlling principle of the cited case is that, though the lands from which minerals are produced are exempt from taxation, minerals when produced and severed from the soil become personal property and as such the exemption from taxation as to the land cannot be extended to such personal property. Moreover, Choate v. Trapp, supra, sets out that plaintiffs in error's tax-exemption attaches to the land itself and is not a personal privilege. It therefore appears to us immaterial that appellants owned the oil here sought to be taxed. Moreover, the royalty interest of appellants under the leases in fact is merely a payment to them as owner of the land upon which the production exists, varying according to the amount actually gotten, reduced to possession, secured, severed from the soil, etc.

In the case of Elders v. Wood, 208 U. S. 226, the Gross Production Tax Act of the state of Colorado was upheld. In that case it was contended that the tax levied upon products from mines situated upon land granted by the United States was invalid for the reason that the operation of such mines was a federal agency which was exempt from a state tax, but the opinion held that

the products obtained from the mines were property belonging to the operators, and the **court said:**

"Such an interest from early times has been held to be property distinct from the land itself, vendable, inheritable and taxable."

See, also Belk v. Meager, 104 U. S. 283; Manuel v. Wulff, 152 U. S. 505; St. Louis Mining & Milling Co. v. Montana Mining Co., 171 U. S. 650.

In Kelly v. Ohio Oil Co., 39 L. R. A. 765, the Supreme Court of Ohio held:

"Petroleum oil is a mineral, and while in the earth it is part of the realty, and, should it move from place to place by percolation or otherwise, it forms part of that tract of land in which it tarries for the time being, and, if it moves to the next adjoining tract, it becomes part and parcel of that tract; and it forms part of some tract until it reaches a well, and is raised to the surface, and then for the first time it becomes the subject of distinct ownership, separate from the realty, and becomes personal property—the property of the person into whose well it came. And this is so whether the oil moves, percolates, or exists in pools or deposits. In either event, it is the property of, and belongs to, the person who reaches it by means of a well, and severs it from the realty, and converts it into personalty. * * *"

See, also, Nonamaker v. Amos (Ohio) 76 N. E. 949, 4 L. R. A. (N. S.) 980; Kelly v. Keys (Pa.) 62 Atl. 911.

In Barnes v. Keys, 36 Okla. 6, 127 Pac. 261, it was held:

"Oil in place is a mineral, and being a mineral, is part of the realty."

While the last-cited case did not distinguish between the nature of the property after it had been reduced to possession and produced, it would be reasonable that the counterpart would be true, that is, that after the mineral is severed from the ground and reduced to possession, it would become personal property. Such conclusion is borne out by the authorities heretofore cited. Since only the land of plaintiffs in error is exempt from taxation, such exemption should not be extended to personal property, and the trend of recent decisions seems to support this view. Shaw v. Gibson-Zahniser, 72 L. Ed. (U. S.) 369.

We now note cases relied upon by plaintiffs in error. As heretofore set out, Barnes v. Key, supra, is not decisive of the issue here. That case does not hold that oil when severed from the soil is anything other than personal property.

Appellants cite State ex rel. v. Snyder (Wyo.) 222 Pac. 758, and the fourth paragraph of the syllabus thereof, which is as follows:

"Under act of admission, section 4, granting school lands to the state, but by section 13, excluding mineral lands, and section 5, requiring disposition by public sale, the proceeds to constitute a permanent school fund, the interest of which only shall be expended for maintenance, but permitting five-year leases, and under Const., art. 7, sec. 2, declaring proceeds from such sales or leases to be a perpetual fund, and Const., art. 7, sec. 7, restricting application of rents from unsold lands to the support of free schools, held, that rents and royalties derived from oil leases are not the ordinary rents contemplated by Const., art. 7, sec. 7, but arise from and represent the corpus of the land, and must be treated as principal becoming part of the permanent school fund, and Laws 1921, c. 66, and laws, 1921, c. 147, amending Comp. St. 1920, sec. 144, are unconstitutional in so far as authorizing diversion of oil rents and royalties from the permanent fund."

It will be noted that the Wyoming court held, under the constitutional provision cited, that the proceeds from the sale of school land should constitute a permanent school fund, consequently that rents and royalties should go to the permanent school fund because they were proceeds from school lands. That decision would be applicable had Congress exempted the lands of the Indians here concerned as well as the proceeds from their lands, but the act of Congress under consideration exempts only the land from taxation, and such exemption cannot be extended by our decision.

Appellants cite State ex rel. v. Hatcher, 281 S. W. 192, wherein the Supreme Court of Texas dealt with the question that was before the Supreme Court of Wyoming in the Snyder Case, supra, and the Texas court held:

"Oil is part of 'land' and can be sold in place."

The constitutional provision is substantially the same as that of Wyoming, in that it required the proceeds from the sale of school lands to go to the permanent school fund. The Texas court held that the rents and royalties were the proceeds from school lands and should go to the permanent school fund and that the act of the Legislature which permitted the use of said money for the construction of buildings for the University

36

of Texas was unconstitutional. The Texas court said:

"If it should be contended that oil, when severed from the land, becomes personalty, that fact is immaterial and would not change the status of such property. It is provided in our Constitution that the 'proceeds' of the land which is gone shall become part of the permanent fund. In other words, not only the realty, but the resulting personalty is a part of that fund. Of course, proceeds arising from an alienation or taking of land, or any portion thereof, is usually money or personality. It was the intention of the framers of our fundamental law that this land, and each portion thereof, should always be in the permanent fund. It was foreseen that it might be best to sell it. In that event it was expressly provided that the substitute for the land should take its place in the permanent fund."

From the quotation above set out, it appears that it was the view of the Texas court that oil when severed from the land became personality, but such fact was immaterial because of the particular constitutional provision applicable to the proceeds from such land.

Appellants cite the case of Pollock v. Farmers Loan & Trust Co., 157 U. S. 429, in which was considered the validity of an act of Congress levying an income tax without regard to the rule of apportionment as required by the Constitution of the United States. The first question there considered was whether a tax on the rental or income of real estate was direct tax within the meaning of the Constitution, and it was held that the same constituted a direct tax requiring apportionment among the states, the same as a tax upon the land itself, and it was held that an income tax upon rents from lands, not apportioned as required by the Constitution among the states, was invalid because it was a direct tax. That such is a proper construction of the holding in the Pollock Case is evidenced by the holding in Evans v. Gore, 253 U. S. 245, where the question involved was as to whether or not the federal government could levy an income tax on the salary of a federal judge, and where it was held that the Constitution of the United States prevented the diminution of the emoluments of a federal judge during his term of office. That opinion recites:

"Let us turn, then, to the circumstances in which this amendment was proposed and ratified, and to the controversy it was intended to settle. By the Constitution all direct taxes were required to be apportioned among the several states according to their population, as ascertained by a census or enumeration (art. 1, sec. 2, cl. 3, and sec. 9, cl. 4), but no such requirement was imposed as to other taxes. And apart from capitation taxes, with which we are now are not concerned, no rule was given for determining what taxes were direct and therefore to be apportioned, or what were indirect and not within that requirement. Controversy ensued and ultimately centered around the right classification of income from taxable real estate and from investments in taxable personal property. The matter then came before this court in Pollock v. Farmers' Loan & T. Co., 157 U. S. 429, 39 L. Ed. 759, 15 Sup. Ct. Rep. 673; 158 U. S. 601, 39 L. Ed. 1108, 15 Sup. Ct. Rep. 912; and the decision, when announced, disclosed that the same differences in opinion existing elsewhere were shared by the members of the court—five, the controlling number, regarding a tax on such income as in effect a direct tax on the property from which it arose, and therefore as requiring apportionment, and four regarding it as indirect and not to be apportioned. Much of the law then under consideration had been framed according to the latter view, and because of this and the adjudged inseparability of other portions, the entire law was held invalid Afterwards, to enable Congress to reach all taxable income more conveniently and effectively than would be possible as to much of it if an apportionment among the states were essential, the Sixteenth Amendment was proposed and ratified. In other words, the purpose of the amendment was to eliminate all occasion for such an apportionment because of the source from which the income came,—a change in no wise affecting the power to tax, but only the mode of exercising it."

Consequently, as we view it, these decisions relied upon by the appellants are not decisive of the issue in their favor.

It is next contended by the appellants that the enforcement of this tax is in violation of section 8, art. 10, of the Constitution of Oklahoma, as well as the Fifth and Fourteenth Amendments to the Constitution of the United States.

The appellants point out that section 8, art. 10, of the Constitution of Oklahoma requires all property to be assessed at its fair cash value, and that section 5, art. 10, supra, requires that taxes be uniform upon the same classes of subjects, and that section 50. of art. 5, of the Constitution of Oklahoma specifies that all property, except as is expressly therein exempt, shall be subject to taxation.

All of these questions presented have been adversely determined by this court.

As to whether or not such Gross Produc-

tion Tax Act constituted an exemption from taxation of that property in lieu of which the gross production tax was levied was decided in Re Gross Production Tax of Wolverine Co., 53 Okla. 24, 154 Pac. 362, in which this court said:

"As to those liable to and who pay a gross production tax, it will be noted that the act does not in terms exempt equipment and machinery, but provides that the payment of the gross production tax shall be in lieu of any other tax that might be levied and collected on said property upon ad valorem basis. This is not an exemption from taxation within the meaning of the constitutional inhibitions, but a substitution of one form of taxation for another upon the terms and conditions named. The equipment and machinery referred to is confined to that used in the actual operation of producing wells, hence, does not include equipment and machinery on hand and not so used. By the act a tax is levied based upon the value of the gross production. This can only arise through the discovery and production of oil or gas. The equipment and machinery owned by the producer, and which is an indispensable agency in the discovery and production of the commodity, forms a part of the property out of which the production arises. Without it production is impossible. The same is not taxed directly, neither are the lands or leases, where the production is through a lessee."

Likewise, in Re Skelton Lead & Zinc Co.'s Gross Production Tax, 81 Okla. 134, 197 Pac. 495, this court said:

"The same section provides also that 'the payment of the taxes herein imposed shall be in full and in lieu of all taxes by the state, county, cities, towns, townships, and school districts and other municipalities * * * upon the machinery, appliances, and equipments used in and around any well * * * and also upon the oil, gas, asphalt, or ores, * * * during the year in which the same is produced.'

"Thus it appears that the sole object of the Legislature was to adopt a practicable means for ascertaining the fair cash value of these smelting plants and equipment 'as going concerns,' and to levy a 'property tax' thereon according to such value, and deeming the gross value of the products therefrom a fair and practical measure for ascertaining such value, it adopted such measure and levied a tax which it specifically provided should be in full and in lieu of all other taxes, and which should be no greater nor less than the general ad valorem rate of 'property tax' upon other property within the state, assessed at its fair cash value."

Thus it appears that the gross production tax is a property tax assessed upon producers of minerals as going concerns and based upon three per cent. of the gross proceeds after and when the subject of the tax is produced. Likewise everything incident to the lessee's production is taxed on a basis of three per cent. of the oil and gas produced and everything incident to the lessor's royalty rights in the production is assessed upon a three per cent. basis of his share of the oil and gas so reduced to possession.

We find no discrimination between the lessor and the lessee, for each is assessed in the same manner and there is no denial to the one or the other of equal protection of the law and no violation of the Fourteenth Amendment to the Constitution of the United States.

The Wolverine Case, supra, dealt with the contention that the gross production tax was in violation of the Fourteenth Amendment to the Constitution of the United States, and came to a conclusion adverse to appellants by concluding that no right vouchsafed by the federal Constitution had been denied or in any wise impaired by the provisions of the statute under consideration. See, also, Protest of Bendelari, 82 Okla. 97, 198 Pac. 606.

We, therefore, conclude that this court has heretofore determined that the act under consideration is not in violation of the uniformity clause or the tax exemption clause of the Constitution of Oklahoma, as well as not being in violation of the Fourteenth Amendment to the Constitution of the United States.

Appellants rely upon: Thomas v. Gay, 42 L. Ed. (U. S.) 740; Gillespie v. State of Oklahoma. 66 L. Ed. (U. S.) 338; Jaybird v. Weir, 271 U. S. 609, 70 L. Ed. 1112; Indian Territory Illuminating Oil Co. v. Oklahoma, 240 U. S. 522. 60 L. Ed. 779; Choctaw, O. & G. R. R. Co. v. Harrison, 235 U. S. 292, 59 L. Ed. 234.

In each of these cited cases, the minerals produced and sought to be taxed were produced from restricted Indian lands under departmental leases, whereas in the instant case the plaintiffs in error were at all times free to lease their land without governmental supervision by reason of the Act of Congress. May 27, 1908.

In Choctaw. O. & G. R. Co. v. Harrison, supra, the gross production tax levied was upon mines of the Choctaws and Chickasaws, and upon segregated and unallotted lands, and wherein it was provided that

the royalty was to be paid into the United States Treasury for educational purposes. The mines were under the supervision of trustees appointed by the President and subject to rules prescribed by the Secretary of the Interior. The lease there considered required the approval of the Secretary of the Interior, and so it was there held that the tax sought to be collected was one upon a federal instrumentality.

In the Gillespie Case, supra, it was sought to collect a tax on a net income derived from leases of restricted Creek and Osage Indian lands, and the leases there considered were departmental leases.

In the Jaybird Case, supra, it was sought to impose an ad vadorem tax upon ore in the bin, though the ore had been produced from the patented allotment of a Quapaw Indian, which allotment was restricted from alienation until 1946. The lease there considered, under which the ore was produced, was executed under the Act of Congress of June 7, 1897, providing for direction and approval by the Secretary of the Interior, and a departmental lease was involved. And so with all of the cases cited.

The cases are not applicable to the matter at bar, for here no federal instrumentality is involved. Apparently no agency of the federal government is exercising supervision over the property in question, and, therefore, we conclude that the tax in question is not a tax upon a federal instrumentality. It is not even contended here that any federal instrumentality is involved, and there is an entire absence of any governmental supervision of appellants' land. Consequently we affirm the judgment of the lower court in sustaining the demurrer of the defendant in error to the petition of the plaintiffs below.

BRANSON, C. J., MASON, V. C. J., and LESTER, HUNT, CLARK, and HEFNER, JJ., concur.