THE OREGON BASIN OIL AND GAS COMPANY,
A Corporation,

*Plaintiff and Appellant,*

vs.

THE OHIO OIL COMPANY, a Corporation,

*Defendant and Respondent.*

(No. 2547; September 9th, 1952; 248 Pac. (2d) 198)

For the plaintiff and appellant the cause was submitted upon the brief of Warwick M. Downing, of Denver, Colorado and Wilfred O'Leary of Cheyenne, Wyoming, and oral argument of Mr. Downing and David Rosner of Denver, Colorado.

For the defendant and respondent the cause was submitted upon the brief of W. H. Everett, George Doll and J. W. Gee, all of Casper, Wyoming, C. R. Ellery and Norman D. Gray, both of Cheyenne, Wyoming, and oral argument of Mr. Everett.

## OPINION

ILSLEY, Justice.

The Oregon Basin Oil & Gas Company, the plaintiff and appellant, brought suit against The Ohio Oil Company, defendant and respondent, to recover some $11,828.99, which sum was deducted from the royalty interest of the appellant by respondent as and for what was claimed to be appellant's share of the tax on appellant's interest in the production of oil. The case was tried upon an agreed statement of facts and judgment was entered dismissing appellant's cause of action, whereupon a direct appeal was taken to this court.

A summary of the agreed statement of facts shows that the predecessors in interest of the appellant beginning July 26, 1913 acquired certain oil lands, the title to which, placer mining claims, leases, deeds, contracts by various mesne conveyances finally lodged respective interests in the oil lands in the appellant and respondent. Since January 1, 1939 to date respondent was the operator and produced oil and gas from the lands, which was subject to the tax prescribed by Article 15, Sec. 3 of the Constitution of Wyoming and the provisions of Sec. 32-1001 to Sec. 32-1006 incl. W.C.S. 1945; pursuant to such provisions the respondent made due return of the production tax to the State Board of Equalization of Wyoming and such Board fixed the assessed valuation of the oil produced for taxation purposes, whereupon the Board, in accordance with its practice of long standing, duly certified to the taxing authorities of Park County, Wyoming, the valuation against which taxes were to be levied and assessed. After the levies and assessments were made respondent was billed for the tax and paid the same to the Treasurer of Park County, Wyoming, upon all oil and gas produced from the lands covered by the vari-

ous leases. That during the period in controversy herein the oil and gas produced would be sold and the proceeds received by respondent, and settlement was made each month by rendering a statement to appellant showing amount of oil and gas produced, the amount of money received and the charge and deduction for tax on appellant's interest upon oil produced, and the amount due appellant for which remittance was made by check. The total charges made by respondent for the portion of said tax on production represented by appellant's interest covered the 1939 production to and including the 1949 production, making in all eleven years and aggregating $11,828.99 as first above set forth, for which appellant seeks recovery. Photostatic copies of the monthly statements on which is shown a deduction for tax on appellant's interest in production covering the time and matter in controversy are attached to the agreed statement of facts as well as copies of all leases, contracts, deeds, conveyances and assignments. There are also attached to the Statement of Facts copies of letters between appellant and respondent wherein, under date of June 21, 1945, Mr. Downing, president of appellant company, demands return of the money deducted as tax on oil produced. The reply by letter, under date of July 14, 1945, by Mr. Everett for the respondent refusing a refund of production taxes. The letters, marked Exhibits "U", "V", "W" and "X", together with the monthly statements referred to above, represent all of the communications between the appellant and respondent with respect to charges for tax on production. Appellant started suit November 25, 1947. Other than the monthly statements and the letters above referred to, there were no other communications in respect to the tax on production. Reference to other matters in the agreed statement of fact will be made in the course of this opinion.

The appellant contends that the tax on the oil as produced should not be deducted from its proceeds.

The respondent insists that the tax on the production of oil should be deducted.

There is a provision in the original mineral lease of July 26, 1913, as follows:

"As a part consideration of this lease, the lessee agrees to pay all taxes assessed and levied on said lands and to do and perform the so-called assessment work which is or may be required by the mining laws of the United States by the Statutes of the State of Wyoming and by the rules and regulations of any mining district in which the lands hereby leased are now or may hereafter be situated."

This provision has been carried through all of the transactions between the parties and is still in effect. The interpretation of this provision must necessarily be made in the light of the transactions between the parties and in harmony with the constitutional provisions and the statutory law of Wyoming.

Another provision of the lease originally provided for the lessor to have a one-tenth part of the oil and gas, which was later modified so as to give lessor two and one-half percent of the same, so that this provision would now read:

"As a further consideration of this lease, the lessee agrees to deliver as royalty to the said lessor two and one-half percent part of all oil and gas found in and saved from said land, provided that the lessee shall have the right to use free of charge and royalty all oil and gas it may need as fuel."

The question as to whether or not a royalty interest in oil lands is real or personal property, if discussed in general terms, may prove to be more confusing than helpful. To those who desire to pursue the subject in respect to all of its ramifications we suggest a study of

Chapter twenty of Summers Oil and Gas, Permanent Edition. For the purposes of the instant case we deem it advisable to discuss the principles of law as they apply in Wyoming, having in mind our constitutional and statutory laws as well as our present Supreme Court decisions.

As to the taxation of mineral interests, including oil, the Wyoming Constitution provides:

*"Article 15, Section 1* provides that: 'All lands and improvements thereon shall be listed for assessment, valued for taxation and assessed separately.'

*"Article 15, Section 3* provides that: 'All mines and mining claims from which * * *, coal, mineral, oil or other valuable deposit, is or may be produced shall be taxed in addition to the surface improvements, and in lieu of taxes on the lands, on the gross product thereof, as may be prescribed by law; provided, that the product of all mines shall be taxed in proportion to the value thereof.' "

The statutory provisions which were enacted with respect to the taxation of the gross products of mines in accord with the above quoted constitutional provisions, are now contained in Section 32-1001, 32-1006 incl. W.C.S. 1945. The first enactment having been made in Chapter 81 Session Laws 1903, and which was in effect when the original lease referred to herein was executed in 1913. This part of Sec. 32-1001 W.C.S. 1945 was enacted in 1903 and is still a part of the Wyoming law, as follows:

"The gross product of all mines and mining claims from which * * * coal, petroleum, or other crude mineral oil, or natural gas, or other valuable deposit is, or may hereafter be produced, while the same are being worked or operated, but not while the same are simply in the course of development, shall be returned by the owner, owners, lessee, or operator thereof for assessment for taxation, and taxed in the manner provided for in this Article and such tax shall be in addition to

any tax which may be assessed upon the surface improvements of such mines or mining claims, and in lieu of taxes upon the land of such claims while the same are being worked or operated; * * *"

Let us start with an unassailable premise. There is no question that under the law the lands here involved were from the beginning in 1913, even as placer claims, subject to taxation. This is so even though legal title remains in the United States, the statement in the brief of the appellant to the contrary notwithstanding.

"Rights as Property.—Although the fee in the land included in a mining location remains vested in the United States until a patent is issued, a perfected mining claim itself is regarded as property in the fullest sense of that term and, as such, may be transferred or mortgaged, or pass by will or descent; *it is subject to liens and to taxation* and may be seized and sold under execution. While the locator's rights are only possessory, his interest is regarded as real property and accorded the same protection as other classes of real estate. Thus, although the government may, through the General Land Office, cancel a claim that is found to be a nullity, it cannot dispose of a valid and subsisting one without making due compensation, as required by law." 36 Am. Jur. 356 § 107.

And, further:

"Nature of the estate as defined by the courts since the enactment of general mining laws.

\* \* \*

"A mining claim perfected under the law is property in the highest sense of that term, which may be bought, sold, and conveyed and will pass by descent. It is subject to administration and sale in payment of the debts of the deceased owner. *It is vendible, inheritable, and taxable,* 'a legal estate of freehold,' and 'subject to the lien of a docketed judgment.' It has the effect of a grant by the United States of the right of present and exclusive possession of the lands located, at least for mining purposes. Actual possession is not more necessary for the protection of the title acquired to such a

claim by a valid location than it is for any other grant. It is in its nature real estate.

"Although the locator may obtain a patent, this patent adds but little to his security." Sec. 539 Lindley on Mines Third Edition p. 1201.

We think it has become axiomatic in Wyoming that oil in place is real estate. Mr. Summers suggests that "*oil royalty* is usually real property, but that *royalty oil* is personal property." Summers Oil & Gas Permanent Edition Vol. 3, Sec. 572, p. 351. The first Wyoming case on the subject is State vs. Snyder 29 Wyo. 163, 212 P. 758, having to do with the matter of the distribution of school funds obtained from certain royalties on oil produced from school lands. The Court said:

"A fundamental fact seems to have been quite overlooked. A document may have a certain, definite effect as between the parties thereto and may determine the relationship and rights existing between them. But we are not at all concerned here with a subject of that kind. We are dealing here with only one side of the contract, the side that receives or is entitled to the royalty and rent, and the dispute existed only between the two beneficiaries on that one side—the permanent fund and the income fund." State vs. Snyder 29 Wyo. 163-187, 212 P. 758.

Again this Court says:

"This must be clear. Oil and gas, while in situ, are part of the realty, part of the corpus of the land. When a portion of it is taken away, the proceeds necessarily arise out of the corpus, and it is humanly impossible to change that simple, plain, physical fact. The character of the proceeds can, obviously, at least as between the beneficiaries, in no possible manner be changed by the nature of the documentary authority pursuant to which the oil and gas is taken out of the ground. Documents do not possess the power of an alchemist, neither do they wield a magician's wand. Whether the oil be taken out of the ground pursuant to a license, lease, sale or any other grant, or without any authority what-

ever, could not in the slightest degree affect the physical fact that it comes from the corpus of the land. If taken and disposed of at all, the effect is clearly a permanent disposition of that much of the corpus, the principal of the land, and irrespective of the authority pursuant to which that is done, the proceeds must go to the beneficiaries according to the rights existing between them—in this case to the permanent fund to which according to the intention of the constitution, the corpus of the property is dedicated, and we can by no subterfuge take it therefrom by simply saying that royalties are rents." State vs. Snyder 29 Wyo. 163, 212 P. 758.

Later in the opinion the court observes:

"The leases themselves, and by themselves, without more, do not accomplish a sale. The final disposition of the oil or gas, or sale, if we please to call it so, does not take place, is not in any event consummated, until after the oil is taken from the earth, has become severed from the realty, and has become personal property." State vs. Snyder, 29 Wyo. 163, 212 P. 758.

We note that this court is careful to analyze each case with care and in accord with the facts as presented in each case. For instance, in Rue vs. Merrill 42 Wyo. 497-509, 297 P. 375:

"We are here dealing with a transaction which, so far as the record shows, was entirely distinct and separate from the sale of the permit, namely, with the transfer of one half of the 7½ percent royalty reserved to Rue in the assignment to Brown. The agreement above mentioned, aside from any contemplated sale and lease of the *lands*, provides substantially that the parties would 'share alike in any moneys, royalties or other revenues.' These refer to the ultimate things to be realized from the permits. Royalty is evidently placed on the same footing as money and other revenue. It could as well be said that the joint adventurers were engaged in selling moneys and other revenues, as that they were engaged in selling royalties."

So that "a percentage of oil and gas produced from lands in a permit or lease reserved by an assignor, is personal property."

In Boatman vs. Andre 44 Wyo. 352, 12 P. (2d) 370, the suit was one to quiet title and involved the question of an abandonment of an oil and gas lease and the cancellation of the same. This court held:

"That right created by the lease is merely to search for oil and gas and, if either is found, to remove it from the land leased. This would appear to make it a profit a prendre, and hence, an incorporeal hereditament, which may be lost by abandonment."

We now come to Denver Joint Stock Land Bank vs. Dixon 57 Wyo. 523, 122 P. (2d) 842. Here the mortgagor executed a mortgage to a bank without making a reservation of the oil rights and later the bank acquired the property by way of a Sheriff's Deed. This court held that the mortgage carried the royalty rights and constituted real property. In discussing the question as to whether the rights involved were real property or personal property this court said: (at page 534)

"We accordingly held in State v. Snyder, supra, that when oil is taken from the ground, part of the corpus thereof is taken. So that it can scarcely be doubted that the right is at least partially connected with the land, and cannot be said to be wholly unmixed with one in real property. It may be said, under our terminology dividing property into real and personal, to be one of a dual nature. It is not, then, perhaps surprising that some of the courts have under particular circumstances, considered the right as personal property."

The court then discusses the question further in this same case at pages 542 and 543:

"Since the law on this subject is said to be still in the formative state it may not be amiss to repeat and amplify some of the statements made in the earlier part of this opinion, indicating, perhaps an independent or additional reason why interests such as herein involved

should be considered real and not personal property, or perhaps, stating these reasons merely in different language. That view to some extent goes back to the case of State ex rel. v. Snyder, supra, and is this: The right to a royalty interest in oil does not merely attach after the oil has been severed from the ground and has become personal property. It is not merely rent issuing out of the annual produce of the land. It goes further than that. The right, extending as it does to oil which is to come from particular land, extends to and is necessarily connected with the corpus of the land, and is, accordingly, a right which exists in the oil which still is in place, inchoate though it may be, follows it as it comes from the ground and still is attached after it has become personal property. To call it personal property is but emphasizing a particular stage of the right on its way to fulfillment. It ignores that it is a right which necessarily extends to part of the corpus of the land. If it were possible to divide the oil in the ground in such a manner that the land in which the royalty portion would be found could, together with the royalty interest, be delivered to the owner of the royalty interest intact, then clearly it would be considered as real property. That is not possible, but in theory the equivalent of that right, aside from bringing the oil to the surface, is substantially the right of the owner of a royalty interest in particular land. The fact that real property, when severed, becomes under our terminology and classification, personal property, should not obscure the real nature of the right. Terminology is convenient, and in fact necessary, but it should not be abused."

In Hageman & Pond et al vs. Clark (Wyo.), 238 P. (2d) 919, it was held that oil and gas interests in land are real property, citing Land Bank vs. Dixon, supra. It is also observed that a right to royalty may be reserved or granted before any mineral lease is executed, and such right is generally termed a "perpetual nonparticipating royalty," where no right is granted or reserved to participate in making future leases.

In State vs. Snyder, supra, this court had the question before it of interpreting and construing sections

2, 6 and 7 of Article VII of the Wyoming Constitution with respect to the disposition of the proceeds arising from the sale of oil produced from the state's school lands. As there stated, oil in situ is a part of the realty and when severed from the corpus retains that characteristic so as to find its way into the permanent school fund. We think that is sound doctrine in the Snyder case when one stops to consider the provisions of Sec. 2, Article 7, of the State Constitution:

"The following are declared to be perpetual funds for school purposes, of which the annual income only can be appropriated, to-wit: * * * all moneys arising from the sale or lease of sections number sixteen and thirty-six in each township in the state, and the lands selected or that may be selected in lieu thereof." 29 Wyo. 180, 212 P. 758.

In the case at bar we are confronted with entirely different constitutional provisions. Reference is made to Article 15, Sections 1 and 3, supra. Here in Section 3 of Article 15, we have a restriction with respect to the taxation of lands. In the law of taxation this inhibition is unusual yet it is found in constitutions of the western states. It is a wise provision. The early settlers and pioneers who developed the West were aware of the necessity for such a provision. Many an early day mining prospector held on to his claim, with a pick and shovel and a sack of grub, because he was sure that his claim would not be lost through a tax sale. It was found through practical experience that it was time enough to levy a tax when the prospector had produced something with which to pay.

We find that the matter of the taxation of the products of mines and mineral claims was most thoroughly debated in proceedings before the Wyoming Constitutional Convention. See Journals and Debates of the Constitutional Convention Wyoming 1889, pages 637 to 695 inclusive. There it was finally decided that

Section 3, Art. 15 should provide for a tax on the "gross product thereof, as may be prescribed by law," instead of a tax upon the real estate.

In Miller vs. Buck Creek Oil Co., 38 Wyo. 505-508, 269 P. 43, it was said: "where the lease is silent on the subject, the obligation to pay taxes ordinarily rests upon the lessor, but this general rule yields to a contrary presumption where ever balancing considerations lead to that result." Again in the same case: "If a mining lease provides that the lessor shall have as royalty a certain share (which might in some cases be a very large share) of the minerals taken from the land, it might well be considered, for the purpose, at least, of taxation, that the lessor was the owner of the oil which he received as royalty, and assumed that, in the absence of an agreement in regard to the payment of a property tax based on production, each party to the lease intended that he should be liable for the tax on his share of the production. See Wolfe County v. Beckett, 127 Ky. 252, 105 S.W. 447, 17 L.R.A. (N. S.) 688." Miller vs. Buck Creek Oil Co., 38 Wyo. 505, 269 P. 43.

So this matter of taxation has been considered by this Court, although in the Miller vs. Buck Creek Oil Co. case nothing was mentioned in the lease under consideration as to who should pay the tax on production.

We have referred to the first part of Sec. 32-1001 W.C.S. 1945, supra. In the December 1933 Special Session of the Wyoming Legislature this Section was amended by adding:

"* * * and said tax shall be a first and prior lien upon the products so levied upon, and the tax thus levied shall be collected from the person against whom the same was levied, if such person has real or personal property within the State, out of which payment can be enforced, and it shall be the duty of the County

Treasurer by distraint, attachment or otherwise, to first endeavor to collect the tax from the person assessed therefor; provided, however, that if the tax can not be so collected, said tax may be enforced against the land from which such products shall be extracted, and said tax from the date of its assessment shall be a lien on the land." Laws 1933 (Spec. Sess.) ch. 54, § 1.

It does seem that had the Wyoming legislature thought that the gross product tax was a tax on the real estate there would have been no occasion for the passage of this amendment. As stated by the Circuit Court of Appeals for the 10th Circuit in Board of Commissioners of Sweetwater County vs. Bernardin 74 F. (2d) 809, in referring to this legislative enactment: "It therefore amounts to a legislative construction of Sec. 3, Art. 15 and the gross product tax statute to the effect that the tax is upon the severed product. A construction of a statute by the legislature, as indicated by a subsequent enactment, is entitled to consideration as an aid in interpreting such statute. Bailey vs. Clark 21 Wall. 284, 22 L. Ed. 651; First Nat. Bank vs. State Missouri 263 U. S. 640-658; 68 L. Ed. 486; Tiger vs. Western Investment Co. 221 U. S. 286-309, 55 L. Ed. 738."

Since the decision in the case of Miller vs. Buck Creek Oil Co., supra, other courts have discussed the principles set forth in that opinion as well as the constitutional provisions of Sec. 3, Art. 15 and the provisions of the Wyoming law, with respect to the production tax as now contained in sections 32-1001 to 32-1006 incl.

That is to say, the United States District Court and the United States Circuit Court of Appeals for the 10th Circuit had occasion to pass upon the nature of the Wyoming production tax. In so doing, the decisions in Miller vs. Buck Creek Oil Co. case and State vs. Snyder, supra, were reviewed in connection with the

Wyoming Constitutional provisions and the Wyoming Statutes referred to above.

It was Judge Kennedy's conclusion in First National Bank of Chicago vs. Central Coal and Coke Co. et al, 3 F. Supp. 443, 436-437 that:

" '*By the foregoing I am inclined to the belief that the Supreme Court leans toward the doctrine announced by so many other courts, that mineral when severed from the land becomes personal property and is taxable as such.* At least, in Buck Creek Case, the Wyoming court has considered the production tax statute and has found that a portion of the tax should be paid by the lessee of the property, which it seems to me, is only consistent with the theory that the tax is upon the product after it becomes severed from the land and holds the status of personal property.' * * *

" '*It is difficult to adopt any theory which will withstand the assault of logic, that mineral when severed from the earth is other than personal property, unless it has been specifically declared otherwise* by constitutional provision or by legislative enactment.' "

In affirming the decision in regard to this phase of the case upon appeal to the 10th Circuit Court of Appeals under the name of Board of County Commissioners of Sweetwater County vs. Bernadin 74 F. (2d) 809, 812, 813, Judge Phillips reviewed and discussed sections 1, 2, 3 of Art. 15 Wyoming Constitution, as well as the gross production tax statutes of this state, stated:

" '*It is well settled that coal and other minerals, when severed from the realty in which they are found, become personalty.* Forbes v. Gracey, 94 U. S. 762, 24 L. Ed. 313; Carpenter v. Shaw, 134 Okla. 29, 272 P. 393, reversed on other grounds 280 U. S. 363, 50 S. Ct. 121, 74 L. Ed. 478; Kelley v. Ohio Oil Co., 57 Ohio St. 317, 49 N. E. 399, 39 L.R.A. 765, 63 Am. St. Rep. 721. It is therefore necessary to determine whether the gross product tax is a tax on the minerals after they have been severed, or a tax on the realty measured by

the gross mineral product thereof. This requires a construction of the pertinent constitutional and statutory provisions of Wyoming.' * * *

" 'The statute, stripped of verbiage, provides that the gross product of all mines and mining claims while they are being operated, shall be returned by the owner, owners, lessee, or operator and assessed for taxation, and that such tax shall be in addition to any tax assessed upon the surface improvements of such mines, and in lieu of taxes upon the 'land of such claims' while they are being worked. *The gross product is the thing which must be returned for assessment and taxation, and not the land. The phrase 'in lieu of taxes imposed upon the land,' indicates that the tax is to be imposed upon the product instead of the land, and that the latter is to be exempted during such time as it is being worked or operated for the production of minerals.'* * * *

We are not unmindful that the decisions of some of the other states reach a contrary conclusion. However, we find that other states have different statutory provisions and some of the states have no constitutional restriction in the matter of taxing mines as real estate. To illustrate, the case Sheffield v. Hogg 77 S. W. (2d) 1021 and Victory vs. Hinson, 102 S.W. (2d) 194 cited by counsel are Texas cases. A careful check of the statutes of Texas discloses that all mines and minerals are taxed as real estate. See Chapter 6, Art. 7146 Rev. Civil Statutes Texas Vol. II, 1925.

What is the situation the case at bar between appellant and respondent? The terms of the 1913 lease as to the intention of the parties seems clear and explicit. The lease sets forth "* * * the lessee agrees to pay all taxes assessed and levied on said lands * * *." Because of the constitutional provision herein discussed there are no taxes assessed and levied on these lands until oil is discovered and produced. In what category did the appellant and respondent place the oil when discovered and produced? Was the oil real estate or was it per-

sonal property?. What was their intention in this regard as disclosed by their actions? The agreed statements of facts shows without dispute that on and after January 1, 1939, when oil was first produced and during the years 1940, 1942, 1943 and 1944, when taxes were charged and deducted by respondent from the account of appellant, no objection was made to such deduction. The question was not raised by appellant until June 21, 1945 at which time by letter the appellant objected and demanded return of the tax so deducted. Respondent by reply letter of July 14, 1945 claimed the tax was properly deducted as a tax on personal property and refused the return of any tax. This suit was not instituted until November 25, 1947. During all of this time many statements were sent by respondent and received by appellant showing the amount of oil produced and the amount of tax deducted.

The acceptance of these statements over a long period of time, when no controversy existed between appellant and respondent seems to us to amount to an admission or an acquiescence in the proposition that the tax was properly deductible. Sometimes "actions speak louder than words." As stated by this court in J. W. Denio Milling Co. vs. Malin 2 5Wyo. 143, 165 P. 1113:

"It is to be assumed that the parties to a contract know best what was meant by its terms, and are the least liable to be mistaken as to its intention; that each party is alert to protect his own interests and to insist on his rights, and that whatever is done by the parties during the period of the performance of the contract is done under its terms as they understood and intended it should be. Parties are far less liable to have been mistaken as to the meaning of their contract during the period while harmonious and practical construction reflects that intention, than they are when subsequent differences have impelled them to resort to law, and one of them then seeks a construction at variance with the

practical construction they have placed upon it of what was intended by its provision." (6 R.C.L., p. 853.) See Rohrbaugh vs. Mokler 26 Wyo. 514, 188 P. 448; First National Bank vs. Ennis 44 Wyo. 497, 14 P. (2d) 201; Wyoming Abstract & Title Co. vs. Wallick 64 Wyo. 458-464, 196 P. (2d) 384; Holliday vs. Templin 56 Wyo. 94, 103 P. (2d) 408.

At this time and in this case we cannot agree with counsel for respondent as to their special defence of "account stated." There is more involved here than an account between the parties. There is a contract existing between the parties, the terms of which are in dispute. It is, therefore, a question of the construction of the contract.

Finding no error in the record the judgment of the trial court is affirmed.

*Affirmed.*

BLUME, C. J., and RINER, J. concur.

Petition for Rehearing denied Nov. 12, 1952, without opinion.