BHP PETROLEUM COMPANY, INC., a
Delaware corporation, Appellant
(Plaintiff),

v.

STATE of Wyoming, Wyoming Tax Com-
mission and its members, Shirley Witt-
ler, Carrol Orrison and Thomas E.
Trowbridge in their official capacities
and the Department of Revenue and
Taxation, State of Wyoming, Appellees
(Defendants).

No. 89–141.

Supreme Court of Wyoming.

Dec. 29, 1989.

William J. Thomson, II of Dray, Madison
& Thomson, P.C., Cheyenne and John C.
Siegesmund of Parcel, Mauro, Hultin &
Spaanstra, Denver, Colo., for appellant.

Joseph B. Meyer, Atty. Gen., Michael L.
Hubbard, Sr. Asst. Atty. Gen., for appel-
lees.

Morris R. Massey of Brown & Drew,
Casper for W.A. Moncrief, Jr. as amicus
curiae.

Before CARDINE, C.J., and
THOMAS, URBIGKIT, MACY and
GOLDEN, JJ.

URBIGKIT, Justice.

A statutory construction issue, singular-
ly important to Wyoming oil and gas pro-
ducers and the Wyoming Department of
Revenue and Taxation, is presented for
consideration of the severance tax liability
of the unit operator defined to be the "per-
son extracting" for production from the
Madden Deep Unit as a unitized field.[1] Ap-
pellant, BHP Petroleum Company, Inc.

---

**1.** Appellant, BHP Petroleum Company, Inc., ac-
curately observes that plans for unitization
come in two general types, although text writers
also observe that wide variations within a class
can exist. L. Hoffman, *Voluntary Pooling and
Unitization,* ch. 4 at 140 (1954). The first class
of unitization agreement exists for exploration
and development purposes. Within that group,
in response to the substantial amount of federal
acreage in Wyoming, the federal unit agreement
is frequently found. The federal unit agree-
ment is authorized by 30 U.S.C.A. § 226(m)
wherever federal lands are included and grants
authority for both unitization and commutation
provisions in leases and the authority of the
Secretary of the Interior to approve a coopera-
tive or unit plan of development or operation.
*See Kirkpatrick Oil & Gas Co. v. United States,*
675 F.2d 1122 (10th Cir.1982) and *Ohmart v.
Dennis,* 188 Neb. 260, 196 N.W.2d 181 (1972).

Obviously, the "federal unit plan" need not nec-
essarily first involve an exploratory and devel-
opment plan. The Madden Deep Unit, however,
was organized as a developmental unit within
the context of the Federal Mineral Leasing Act.
Gray & Swan, *Fieldwide Unitization in Wyo-
ming,* VII Land & Water L.Rev. 433, 435 (1972)
states that "[o]n federal lands, the exploratory
type of unit under which lands are unitized
before the first exploratory wells are drilled also
has been widely used."

The second class of unit agreements are cre-
ated for production purposes and may invoke
forced pooling. *See* W.S. 30–5–110. This class
of unitization was especially adopted for sec-
ondary recovery purposes. Gray & Swan, *su-
pra,* VII Land & Water L.Rev. 433. *Cf.* Com-
ment, *Wyoming's New Unitization Statute,* VI
Land & Water L.Rev. 537 (1971).

(unit operator), by a declaratory judgment complaint, challenged intended assessment on it of all severance tax within the unit. The judgment of the district court validated the unit operator tax assessment and we affirm on present appeal.

The issue presented as narrowly defined yet exceptionally important in procedural effect is stated by BHP whether it "merely by virtue of being the contract operator of a federal oil and gas unit was a 'person extracting' 100% of the natural gas from the unit, within the meaning of WS § 39–6–307(e)." As rephrased by the State, more immediately demonstrating the substantive economic issue, we are asked whether "appellant is a 'person extracting' within the meaning of W.S. 39–6–307(e) and is therefore liable for the tax deficiency imposed by the Department."

The statutory provision states:

2. When originally enacted with first passage of the Wyoming severance tax in 1969, the comparable provision, Wyo.Sess.Laws ch. 193, § 9 (1969), provided:

> Any person extracting products under this act, and every person owning an interest in said products to the extent of their interest ownership shall be liable for the payment of the tax imposed by this act, together with any and all penalties and interest, and the tax shall be and become a lien upon the interest of any owner and the interest of any person extracting any such products from and after the time the same are extracted until the tax is paid thereon.

The title clause of that act included within its provisions "an act * * * providing for deduction by *operators* [of] a proportionate share of the tax from the share of interest owners * * *." Wyo.Sess.Laws ch. 193 (1969) (emphasis added). The legislature also provided that "[e]very person, partnership, corporation, company, firm or association of whatever nature, extracting any of the products hereinabove described shall be required to report the gross production * * *." *Id.* at § 3. Additionally, the legislature said:

> Any person upon which a tax is imposed by this act for extracting any of the products referred to shall have the right and be empowered to deduct the tax so paid from any amounts due or to become due to the interest owners of such products in proportion to the interest ownership thereof.

*Id.* at § 7.

Constitutionally required legislative bill titles, Wyo. Const. art. 3, § 24, dictating expression of the subject of the bill in the title justifies use of the information as worthy of consideration for

> Any person extracting valuable products subject to this article, and any person owning an interest in the valuable products to the extent of their interest ownership are liable for the payment of the taxes imposed by this article together with any penalties and interest. The tax is a lien upon the interest of any owner and the interest of any person extracting any valuable deposits from and after the time they are extracted until the taxes are paid. The tax lien shall have preference over all liens except any valid mortgage or other liens of record filed and recorded prior to the date the tax became due.[2]

W.S. 39–6–307(e).

This is the second appearance of this case before this court. On first appeal, the district court denied jurisdiction of the determination of the purpose of the legislation. *See Sanchez v. State,* 567 P.2d 270 (Wyo.1977) and *Wyoming State Treasurer ex rel. Workmen's Compensation Dept. v. Niezwaag,* 452 P.2d 214 (Wyo.1969). Consequently, the reference in the title to Wyo.Sess.Laws ch. 193 (1969) to the *operator's* right of deduction of a proportionate share of the tax against interest owners is significant as demonstrating the initial process developed and the continuing procedure since utilized by the Wyoming Department for processing the tax.

A portion of the mineral severance tax is constitutionally emplaced by the creation of a permanent Wyoming mineral trust fund, Wyo. Const. art. 15, § 19, adopted December 12, 1974, which requires collection of the excise tax "on the value of the gross product extracted." Consequently, the collection statutes are in part addressed to a specific constitutional responsibility requiring "[t]he legislature * * * provide by law for an excise tax * * *." Of the total tax assessed on covered minerals, one and one-half percent is constitutionally earmarked for this permanent trust fund. Consequently, analysis of a severance tax collection procedure is impressed with a constitutional responsibility of present government to collect for the state's future measured on the value of the gross product extracted. The constitutional amendment was adopted by vote of the people of the state with familiarity about a system first created in passage of the 1969 severance tax act, Wyo.Sess. Laws ch. 193 (1969). "How to do it" is discretionary within legislative decision. To do it at full value is not discretional for any branch of the state government. *Rocky Mountain Oil and Gas Ass'n v. State Bd. of Equalization,* 749 P.2d 221 (Wyo.1987).

claratory judgment complaint based on the procedural and factual posture of the case involving exhaustion of administrative remedies. We reversed and remanded for a district court interpretation of the statutes and regulations challenged by BHP. *BHP Petroleum Co., Inc. v. State, Wyoming Tax Com'n*, 766 P.2d 1162 (Wyo.1989). A second hearing was held before the district court on April 10, 1989, at which time both BHP and the State presented testimony and documentary evidence. By an opinion letter dated April 13, 1989, the district court held that because BHP was the operator of the Madden Deep Unit, it was a "person extracting" all of the gas from the unit within the meaning of W.S. 39–6–307(e) and was liable for severance tax on this gas.

The factual background of the controversy is well-stated in our prior opinion and will not be repeated except as reference becomes necessary to involve additional facts in discussion of the litigants' argument. May it suffice generally that the State is attempting to collect severance tax from BHP as the unit operator for the Madden Deep Unit which includes leases in Fremont and Natrona counties in central Wyoming.

The Madden Deep Unit natural gas production goes to zones below 20,000 feet with high volumetric production within an extended geographical area. File documents reflect that in addition to BHP and the amicus curiae, W.A. Moncrief, Jr. (holding a large working interest), there are approximately twenty-eight other working interest owners and perhaps more than 100 royalty interest owners. BHP's working interest ownership is relatively small in total percentage ranging from about 8.4 percent to 12.7 percent.[3] The Madden Deep Unit agreement was first executed on May 1, 1967 for about 70,000 acres with Erving Wolf, d/b/a Wolf Exploration Company as unit operator. It was then revised June 17, 1969 to change terms and operators. The basic agreement was a printed form, Rocky Mountain Unit Operating Agreement Form 2 (Divided Interest) January, 1955, which form was a product of the Rocky Mountain Mineral Law Foundation. The 1969 agreement was supplemented or amended by a June 2, 1975, Supplemental Unit Operating Agreement, for depths 5,500 feet below the Waltman Shale. Monsanto Company became the operator by that agreement. Responsibility was then transferred to its one-time subsidiary, Monsanto Oil Company, which has since been renamed to BHP and has constituted the operator since 1982. The unit involves land in five townships including federal, state and fee acreage.

It is noteworthy that the general system is different from a typical pooling agreement of many production type unitization fields. Right, title and interest to the mineral estate is not conglomerated, but rather each working interest owner retains ownership in the proportionate share and is entitled to make arrangements for sale of the product in any fashion desired. Consequently, the unit operator is generally not involved in contracting product sale and only releases gas in the name of working interest owners based on monthly nominations as directed to specific wells for production.

The unit operator files periodic reports with state and federal agencies and the

---

**3.** The Madden Deep Unit is one of the major oil and gas production units presently operating in Wyoming, but only one of a large number of unitized areas in the state. It may be exceptional in the large number of working interest owners. Unitization and forced pooling is not an unexplored litigative subject in this state. *Majority of Working Interest Owners in Buck Draw Field Area v. Wyoming Oil and Gas Conservation Com'n*, 721 P.2d 1070 (Wyo.1986); *Trout v. Wyoming Oil and Gas Conservation Com'n*, 721 P.2d 1047 (Wyo.1986); *Gilmore v. Oil and Gas Conservation Commission*, 642 P.2d 773 (Wyo. 1982); *Larsen v. Oil and Gas Conservation Com-*

*mission*, 569 P.2d 87 (Wyo.1977); *Mitchell v. Simpson*, 493 P.2d 399 (Wyo.1972); *Inexco Oil Co. v. Oil and Gas Conservation Commission*, 490 P.2d 1065 (Wyo.1971). See also Gifford, *The Law of Oil and Gas in Wyoming: An Overview*, XVII Land & Water L.Rev. 401 (1982); Gray & Swan, *supra n. 1*, VII Land & Water L.Rev. 433; Comment, *supra n. 1*, VI Land & Water L.Rev. 537; Comment, *Secondary Recovery Operations—Protection of Correlative Rights*, II Land & Water L.Rev. 129 (1967); and Note, *The Constitutionality of Wyoming's Oil and Gas Compulsory Pooling Provision*, 6 Wyo.L.J. 300 (1952).

Wyoming Department of Revenue and Taxation. Generally speaking, it has also paid quarterly installment taxes for severance tax assessments on behalf of most working unit interests but, in current time, has neither been responsible for filing the specific tax forms nor payment of the tax for one of the major interest holders, Moncrief, who filed an amicus curiae brief.

The aegis of this particular litigation demonstrates the economic issues involved for both the operator and the state. The fundamental conflict in deficiency assessment arose from gas pricing for assessment valuation with the specific issue apparently developing from some gas purchase contracts where the buyer repaid ad valorem taxes to the vendor as a price consideration. The question whether taxation valuation should include or exclude the add on tax repayment creates the price differential. That substantive issue of valuation pricing is not presented in this litigation. However, if the Wyoming Department of Revenue and Taxation is correct and the higher price is taxable, there is a deficiency due on past production that in preliminary notices totaled about $880,000 plus penalties and interest to total a potential assessment of more than $1.8 million. Obviously, there could be other pricing features of individual purchase contracts whereby the State could contend that the price received was understated and the tax underpaid.

If so, who is liable for the deficiency? BHP contends that only the working owners can be reached for deficiency collection. Conversely, the State contends the operator should pay and can pursue reimbursement under the unit agreement and applicable statutes from the working interest owners who may also have reimbursement questions with regard to payments made to royalty and override interest holders. BHP does not contend the State lacks authority to impose the tax collection duty on the operator. It makes the argument that the statute does not now impose on it that very arduous payment responsibility and particularly so in cases where a deficiency on past payments may occur. Consequently, we consider whether the district court

was correct in its interpretation of the statute which decision is a matter of law. See *Attletweedt v. State*, 684 P.2d 812 (Wyo. 1984) and *McGuire v. McGuire*, 608 P.2d 1278 (Wyo.1980) which direct this court to make sense out of a statute and give full force and effect to the legislative product. We are not persuaded by either party that we can dispose of this appeal by application of the first rule of statutory construction by finding a clearly stated plain and ordinary meaning. *State Bd. of Equalization v. Jackson Hole Ski Corp.*, 737 P.2d 350, *reh'g granted* 745 P.2d 58 (Wyo.1987); *Amoco Production Co. v. Hakala*, 644 P.2d 785 (Wyo.1982).

There are a combination of statutory construction concepts presented by these litigants to assist this court in determining whether "any person extracting" is "the oil field unit operator." Both litigants persuasively argue hardship and complexity in the countervailing adaptations. The contention is developed from the realistic belief that "[t]ax statutes should have a practical construction." *State Bd. of Equalization v. Cheyenne Newspapers, Inc.*, 611 P.2d 805, 813 (Wyo.1980). Each litigant then factually argues interpretation of the unit agreements to determine whether the unit operator extracts in terms of statutory taxation responsibility.

Where the arguments diverge is in BHP's appellate definition of operator in an *ownership concept* that the mineral interest owner extracts while the State argues from an *operational concept* that the entity which physically does the extractive work, mainly the unit operator, is the extractor. BHP adds the further argument that the State would make the field hand or pumper also initially liable for the tax. BHP finds a prospective redundancy in the language under the state construction from the phraseology of "any person extracting" to the provision "any person owning an interest." *See Basin Elec. Power Coop. v. State Bd. of Control*, 578 P.2d 557 (Wyo. 1978). The State responsively argues for the continuity of a history of interpretation since the severance tax enactment in 1969 and a similar application to all unitized

fields within the state since that date. This divergence sustains a conclusion of contended ambiguity since "a single term can fairly be said to mean different things." *Amoco Production Co. v. State*, 751 P.2d 379, 381 (Wyo.1988).

The principal argument of BHP to obtain a different adaptation from historical practice is derived from the nature of the retained control of individual working interest owners as to when and how production is actually accomplished for their separate sale. The nomination process utilized for production is contended to be significant when conversely compared with the full interest operation where a single sale and unitary production arrangement is utilized in the more typical production unit. Basing their argument then on the ownership concept of the working interest holders as the "person extracting," BHP conceives that as to its non-owned interest, it serves a function as an operational contract agent which is not essentially different from that performed by the pumper and field hands.[4] We reject this analysis.

It is apparent that a taxation reporting and collection burden exists and it is within legislative responsibility to determine whether the burden will be placed on the unit operator or assumed by the state agency. Whatever this court elects to do in present analysis of the 1969 statutory language, the legislature will retain the option to change the responsibility in future sessions. Under the separation of powers, the legislature does have both the budgetary and revenue raising responsibilities with which this court will not properly interject itself in contravention of Wyo. Const. art. 2, § 1, except to interpret that "legislative intent." *See also Mauler v. Titus*, 697 P.2d 303 (Wyo.1985) and Wyo. Const. art. 3, § 1.

In application, we follow the operational definition of "person extracting" and conclude, as did the district court, that BHP, by contracting to assume physical activity responsibility, extracts the mineral resource for the working interest owners. We are provided significant support in this analysis by examining the history of the severance tax since 1969 and the consistent practice of the State in assessment responsibility. *Oregon Basin Oil & Gas Co. v. Ohio Oil Co.*, 70 Wyo. 263, 248 P.2d 198 (1952).[5] The legislature has frequently been called to alter and amend the severance tax statutes since original adoption and has not seen fit to change the well-established State policy in this definition of the responsible party for tax reporting and payment. If ever a practice of the State, *cf. Rocky Mountain Oil and Gas Ass'n v. State Bd. of Equalization*, 749 P.2d 221

**4.** The files and testimony do reflect that BHP provides minimal personnel at the field and essentially subcontracts all of the physical activities required in opening valves and reading meters for production. In characterization, the function of BHP is managerial and not with its own personnel operationally employed. BHP also argues that it is not necessarily privy to the terms of sales agreements executed by working interest owners and consequently may not have the actual information upon which it can, with accuracy, determine amounts of tax due. Intrinsic to the status of this case as presently developed is both the longstanding examination by legislative committees of petroleum product pricing for tax purposes and on-going audits by state and federal agencies of amounts of tax paid which have, on occasion, established significant underpayment. It is understandable why BHP disclaims interest in becoming its brother's tax keeper under these circumstances. The countervailing posture of the State is that today, there are roughly a thousand operators and 15,000 producing wells in the state. If there were twenty to thirty working interest owners in the individual wells times the 15,000 wells, the State says "we haven't got a big enough building to hold the paper." In practical fact, the argument of the State was obviously exaggerated but, without question, the singular increase from the 1,000 taxation entities which report and pay the severance tax would obviously occur and possibly in the range of tenfold or more.

**5.** We do not find the lack of clarity about past practices of the State in unit operator assessment that is suggested by contention in the briefs. The first unit agreement for the Madden Deep Unit predated passage of the severance tax by two years. The testimony clearly demonstrates that the Wyoming Department of Revenue and Taxation has consistently considered the operator to be the reporting and tax paying entity. *Oregon Basin Oil & Gas Co.*, 248 P.2d 198. Other generalized testimony in the record reveals a consistent history of revenue department operation.

(Wyo.1987), has validity, this case persuades us that legislative intent is observable and a definition of terms strengthened from the historical practice which remains unamended in statutory language.[6]

The Wyoming severance tax is an excise tax upon the current and continuing privilege of extracting minerals.

> The tax is not levied upon the preceding year's production, and that production is not called upon to bear the burden of the tax. The tax is not an ad valorem tax. The statute is very plain in stating that it is an excise tax laid upon the present and continuing *privilege* of extracting minerals. The value of the privilege is measured by applying a certain percentage figure to the gross production of the previous year. A statute is not necessarily retroactive because it draws on antecedent facts for its operation.

*Belco Petroleum Corp. v. State Bd. of Equalization*, 587 P.2d 204, 210 (Wyo.1978) (footnote omitted and emphasis in original). *See likewise Amoco Production Co.*, 644 P.2d 785. Within this context of the incident of taxation resulting from removal, we are provided the dispute about who extracts—the operator who does it for the owner physically within the unit or the operator whose property is extracted, whether or not directly done or by an agent such as the unit operator.

We are not persuaded that the decision on statutory interpretation is answered by argument that ultimate liability rests with the product owner against whom a lien may be impressed. We perceive that the legislature interdicted a liability upon the entity that extracts and impressed a lien against any owner who receives and sells. Consequently, the lien liability follows the product from which production the taxable incident and liability arose. W.S. 39–6–304(h). For a historical perspective, see *Miller v. Buck Creek Oil Co.*, 38 Wyo. 505, 269 P. 43 (1928).

Rules of strict construction on taxation statutes, Sutherland Stat. Const. § 66.01 (4th ed. 1986), are not involved. No issue of either the existence of a taxation responsibility nor its amount is presented in this proceeding. The rather ordinary but terribly significant question presented is to determine the party against whom initial responsibility is imposed as a statutory imposition. BHP seeks a construction favorable to one taxpayer which would then move the burden on to another to be the reporting and paying obligor. No strict construction rule can consequently be applied since someone is obligated to pay. The inheritance tax case of *Kelsey v. Taft*, 72 Wyo. 210, 263 P.2d 135 (1953) questioning the existence of any tax liability is inapplicable. In *Belco Petroleum Corp.*, 587 P.2d 204, the issue was liability and not who pays and the strict construction rule for taxation was applied in approval of the tax for the production during the year prior to the date of taxation statute passage. Compare *Jackson Hole Ski Corp.*, 737 P.2d 350, where both the appropriateness of the tax and existence of the statutory authority was litigated.

Likewise inapposite is any determination of tax responsibility from oil and gas ownership concepts determining privilege to extract. *See* 8 H. Williams & C. Meyers, Oil & Gas Law 1086 (1987). The authority of the legislature to determine the functional taxpayer is not in question and we apply a functional construction of the Wyoming severance tax statute to emplace responsibility on the entity performing the physical operation. This is also consistent with the early Wyoming procedure statutes and case law for the ad valorem tax where it was "the practice of the state board of equalization to assess the entire tax against the operating and producing company." *Miller*, 269 P. at 45.

---

**6.** See Sunstein, *Interpreting Statutes in the Regulatory State*, 103 Harv.L.Rev. 405, 503 (1989) which states:

> Under the approach suggested * * *, the statutory text is the foundation for interpretation, but structure, purpose, intent, history, and "reasonableness" all play legitimate roles. It is possible, moreover, to distinguish among those roles, and thus to produce a system in which dictionary definitions of statutory terms ordinarily suffice, but are subject to various forms of contextual qualification.

In practical operation, we perceive that a simple taxation reporting and collection plan was enunciated by the legislature and applied by the Wyoming Department of Revenue and Taxation for taxation of the product produced in the unitized field. First, the unit operator is responsible for the reporting of the production and payment of the taxes on the entire well production, W.S. 39-6-304(a) and 39-6-307(e). Additionally, the tax is a lien on the interest owner (of any part of the produced mineral) until the tax is paid. W.S. 39-6-304(k); 39-6-307(e). The taxpayer paying the tax may deduct the tax from any amounts due or to become due to the interest owner, W.S. 39-6-304(h), or enforce other rights for reimbursement that may be provided in the contractual unit agreement documents. Consequently, we distinguish between the initial obligation to report and pay and the ultimate liability of the amount by approving the conclusion and decision of the district court. *Ashland Oil Co. v. Jaeger*, 650 P.2d 265 (Wyo.1982); *Oregon Basin Oil & Gas Co.*, 248 P.2d 198; *Miller*, 269 P. 43.

Affirmed.