**PREFERRED ENERGY PROPERTIES, Appellant (Petitioner),**

v.

**WYOMING STATE BOARD OF EQUALIZATION, Appellee (Respondent).**

No. 94–42.

Supreme Court of Wyoming.

Feb. 28, 1995.

Neil J. Short, Casper, for appellant.

Joseph B. Meyer, Atty. Gen., Michael L. Hubbard, and Clinton D. Beaver, Sr. Asst. Attys. Gen. Argument presented by Mr. Beaver, for appellee.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.

LEHMAN, Justice.

Preferred Energy Properties (Preferred), an owner of several oil and gas leases, appeals a determination of liability for unpaid severance and ad valorem taxes.

We affirm.

Preferred presents three issues:

1. Whether the State Board of Equalization erred by imposing severance and ad valorem taxes on Appellant even though Appellant was not the operator of the subject properties during the taxable periods in question.

2. Whether the State Board of Equalization erred by imposing severance and ad valorem taxes on Appellant even though Appellant did not receive production nor production proceeds from the subject properties during the taxable periods in question.

3. Whether the second order entered by the State Board of Equalization on March 15, 1993 * * * is void: A) for failing to make sufficient findings of fact in violation of W.S. § 16–3–110; and B) because the W.S.B.O.E. exceeded its powers as an administrative agency by interpreting a contract and applying contract law.

Appellee Wyoming State Board of Equalization (the Board) restates the issues:

I. Did the Board of Equalization exceed its jurisdiction by considering the terms of Petitioner's Farmout Agreement?

II. Was Petitioner a lessee under W.S. 39–3–101(d)?

III. Was Petitioner a person owning an interest in the valuable products under W.S. 39–6–307(e)?

## FACTS

This dispute concerns who is liable for past severance and ad valorem taxes due on certain oil wells located in Natrona County. Preferred was operated by Walter Guion, as guardian for his daughter. In November of 1981, Preferred acquired the subject property. Subsequently, a farmout agreement was executed with Penexx Operating Company. Under the terms of the agreement, Penexx was to operate the wells and, in return, receive the production proceeds. Preferred was to receive any proceeds in excess of a certain minimum amount.

A dispute about the farmout agreement resulted in litigation between Preferred and Penexx in California. In May of 1985, the California court appointed Walter Guion/Preferred to "operate field on behalf of operator [Penexx] named in farmout agreement in accordance with good oil field practice & will protect the property from all liens & encumbrances." Guion was also ordered to "deposit balance of all funds received less only operating expenses & landowner royalty in

interest bearing CD signed by both Preferred & Penexx." While acting under the court order, Preferred paid some of the severance taxes owing; apparently no other severance or ad valorem taxes were paid during this period. The litigation was settled in 1990, and Penexx executed quitclaim deeds on the property to Preferred.

In 1990, the Department of Revenue issued assessments to Preferred for delinquent taxes on the property. Preferred appealed the assessments to the Board, which affirmed the assessments and interest on June 3, 1992. Preferred then appealed to the district court, which remanded the case back to the Board for further findings. The Board made supplemental findings and conclusions but did not modify the original order. The district court then certified the case to this court.

## DISCUSSION

██ Liability for severance taxes is provided for by W.S. 39–6–307(e) (1994):

*Any person extracting valuable products subject to this article and any person owning an interest in the valuable products to the extent of their interest ownership are liable for the payment of the taxes imposed by this article together with any penalties and interest.* The tax is a lien upon the interest of any owner and the interest of any person extracting any valuable deposit from and after the time they are extracted until the taxes are paid. The tax lien shall have preference over all liens except any valid mortgage or other liens of record filed or recorded prior to the date the tax became due.

(Emphasis added.) Preferred seizes upon the language "[a]ny person extracting valuable products" to argue that it is not liable for the taxes. Preferred contends that at all times Penexx was the operator of the wells and thus solely liable for the taxes as the "person extracting valuable products." Preferred relies on our decision in *BHP Petroleum Co., Inc. v. State*, 784 P.2d 621 (Wyo. 1989) to support its contention that the oper-

ator, and only the operator, is liable for the tax.

In addition, Preferred attempts to defuse the impact of the California court order which made it the operator of the field during the litigation. Essentially, Preferred claims that it was not really the operator because it was operating "on behalf of Penexx" and the order did not give Preferred the authority to pay any taxes.[1]

Initially, we do not agree with Preferred's narrow interpretation of W.S. 39–6–307(e) and *BHP*. The statute unambiguously imposes liability for the tax on two groups: any person who is extracting the valuable products and any person who owns any interest in the valuable products up to the amount of their interest. In *BHP* we concluded that an operator is a "person extracting valuable products" under the meaning of that phrase in that statute. *BHP*, 784 P.2d at 625. In fact, in *BHP* we found that primary liability for the tax fell on the operator, while the tax was a lien on the interest owner until it was paid:

In practical operation, we perceive that a simple taxation reporting and collection plan was enunciated by the legislature and applied by the Wyoming Department of Revenue and Taxation for taxation of the product produced in the unitized field. First, the unit operator is responsible for the reporting of the production and payment of the taxes on the entire well production, W.S. 39–6–304(a) and 39–6–307(e). Additionally, the tax is a lien on the interest owner (of any part of the produced mineral) until the tax is paid. W.S. 39–6–304(k); 39–6–307(e). * * * Consequently, we distinguish between the initial obligation to report and pay and the ultimate liability of the amount[.]

*BHP*, 784 P.2d at 627. It is undisputed that the tax was not paid by the operator (whether Penexx or Preferred); therefore the tax was a lien on the interest owner, and the Department of Revenue could turn to it for payment of the tax. As we noted in *BHP*, this does not affect the ability of the ultimate

---

1. The order required Preferred to "protect the property from all liens & encumbrances," while W.S. 39–6–307(e) states that unpaid taxes will become a lien on the property. Thus Preferred's claim that it did not have authority to pay the taxes is dubious, at best.

taxpayer from seeking reimbursement pursuant to contractual agreements. *Id.*

The key to this case, then, is whether Preferred was "any person owning an interest in the valuable products." The Board concluded that Preferred was an owner based on the Farmout Agreement with Penexx.

> The Department carried its burden of going forward on this issue [liability for the severance tax under W.S. 39–6–307(e) ] by evidence of the leases naming Preferred as lessee. The question then becomes whether Preferred carried its burden of proof to show it has either no interest in the valuable products, or a lesser interest ownership than assessed by the Department. We conclude Preferred did not carry its burden as to either issue. By the terms of the farmout agreement, no interest in the property could be "earned" by Penexx prior to completion of the well and separate assignment of a working interest from Preferred. More importantly, though, the farmout agreement does not transfer the right to sell the mineral product from Preferred to Penexx, and indeed seems to contemplate receipt by Preferred of proceeds from oil sales. Any facts indicating Penexx controlled the oil sales, received the receipts, failed to make payment to Preferred, failed to properly report to Preferred, or failed to adhere to conditions and covenants of the farmout agreement, are contractual disputes relating to performance under the farmout agreement, do not affect ownership in the mineral production, and thus are not subject to Board adjudication. The State was not a negotiating party to the farmout, thus performance thereunder (as opposed to the legal terms thereof), should not cause the State to suffer a shifting of tax liability and responsibility to pay. The terms of the farmout agreement, while primarily conveying certain rights to oil proceeds, *do not* convey any interest in the property or mineral production from Preferred to Penexx.

Preferred attacks the Board's conclusion on three grounds. First, Preferred insists that the Board, as an agency, has no authority to interpret and adjudicate rights under a contract. Therefore, the Board went beyond its authority and jurisdiction in interpreting the contract to find an ownership interest in Preferred.

▮▮▮ An administrative agency does not have the power to settle and adjudicate the rights of parties under a contract. *Tri–County Electric Ass'n, Inc. v. City of Gillette,* 525 P.2d 3, 9 (Wyo.1974). The reasoning behind the rule is that an agency only has such powers as are granted to it by the legislature. *Hupp v. Employment Sec. Comm'n,* 715 P.2d 223, 225 (Wyo.1986). Thus, unless an agency has been specifically granted the power to settle and adjudicate rights and obligations between parties to a contract, it does not have that power.

▮▮▮ However, what the Board did in this instance was not a settlement or adjudication of the rights under the contract between Penexx and Preferred. The Board simply looked at the contract, which was offered into evidence by Preferred, to see whether or not it supported the proposition that Preferred was an owner under the statute. We hold that an administrative agency, while prohibited from settling or adjudicating rights under a contract, may use a contract as evidence to support its findings or to refute a party's position. See W.S. 16–3–107(c) (1994 Cum.Supp.) (agency can require production of any relevant documents). Of course, the agency's interpretation of the contract will be subject to judicial review if a party claims error. See W.S. 16–3–114 (1990) (providing for judicial review of agency actions). Furthermore, the Board's use of the contract to support a finding of tax liability on behalf of Preferred would not be res judicata or collateral estoppel if future litigation would arise concerning rights and obligations under the agreement since the other party to the contract, Penexx, was not a party to the tax proceeding.

Second, Preferred contends that the Board did not make any finding that it received or had a right to receive any production proceeds for the period in question. This, Preferred maintains, is fatal to the Board's claim that it was an owner because without it there

is insufficient evidence to support a determination that it was an owner.

We disagree. The Board specifically found that Preferred had not conveyed to Penexx any interest in the property or in the mineral production.

> The terms of the farmout agreement, while primarily conveying certain rights to oil proceeds, *do not* convey any interest in the property or mineral production from Preferred to Penexx.

While it is expressed in the negative, the Board found that Preferred had retained all of its interest in the property including its right to receive the mineral production. Preferred's argument is without merit.

Lastly, Preferred claims that severance and ad valorem taxes are levied against personal property, not real property; and since Penexx owned the minerals after extraction, its interest was one of real property, not subject to the tax.[2]

As we already noted, the Board found that Preferred had not conveyed its interest in the mineral production, thus retaining an ownership interest in the mineral production. That finding is supported by the evidence, specifically, the farmout agreement:

> [Penexx] agree[s] that during the entire term of this agreement and any subsequent agreements (working interest, etc.) arising from this agreement, that [Penexx] will pay or cause to be paid to [Preferred] a minimum royalty of Ten Thousand Dollars ($10,000) monthly. * * *

>   \*   \*   \*   \*   \*   \*

> Upon written request, and after completion of the test well provided hereinabove in accordance with all the terms and provisions of this agreement to [Preferred's] satisfaction, [Preferred] agree[s]:

> (A) That a working interest equal to Fifty Percent (50%) of [Preferred's] working interest in any and all depths on the particular ten acre parcel on which [Penexx has] completed a test well producing an economically justifiable amount for a period of thirty days shall be forthwith assigned to [Penexx].

> (A–1) In addition to the working interest described in (A) above, that Fifty Percent of the proceeds [Preferred] receive[s] from [its] remaining Fifty Percent of [its] working interest, over and above the minimum royalty called for in this agreement, shall be forwarded forthwith upon [Preferred's] receipt to [Penexx] until such time as [the] total cost of drilling and completion are recovered by [Penexx].

The record is completely devoid of any evidence that any further conveyance to Penexx occurred. It is clear from the agreement that Preferred retained the right to proceeds from production; therefore, the Board did not err in finding that Preferred had an ownership interest in the property which was subject to severance and ad valorem taxes.

## CONCLUSION

Preferred owned an interest in the subject property and, consequently, was liable for severance taxes up to the amount of its interest pursuant to W.S. 39–6–307(e). Preferred is also liable for the assessed ad valorem taxes.

Affirmed.

---

2. While ostensibly challenging the assessments for both severance and ad valorem taxes, this is the only argument in which Preferred directly addresses the ad valorem tax issue. In its Summary of Argument, Preferred claims that it is not liable for ad valorem taxes but then fails to provide us with any cogent argument (except for the one above) as to why it is not liable. Therefore, we will consider the ad valorem taxes in the context of the above argument only.